

## NUMBER 13-08-00268-CV

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

SJW PROPERTY COMMERCE, INC. N/K/A
LEASING HOLDING, INC., AND PROPERTY
COMMERCE DEVELOPMENT COMPANY N/K/A
DEVELOPMENT HOLDING, INC.,                              Appellants,

v.

SOUTHWEST PINNACLE PROPERTIES, INC.,
JACKSON I, CORP., PALMER ENTERPRISE INC.,
AND G.J. PALMER, JR., INDIVIDUALLY,                     Appellees.

On appeal from the County Court at Law No. 2
of Hidalgo County, Texas.

## OPINION ON REHEARING

Before Chief Justice Valdez and Justices Benavides and Vela
Opinion on Rehearing by Chief Justice Valdez

On May 28, 2010, appellants, SJW Property Commerce, Inc. ("SJW") and Property

Commerce Development Company ("PCDC"), moved this Court to rehear its original opinion issued in this matter on April 28, 2010. No response has been filed by appellees, Southwest Pinnacle Properties, Inc. ("SPP"), Jackson I Corp ("Jackson"), Palmer Enterprises ("PE"), and G. J. Palmer Jr., individually. After considering SJW and PCDC's motion for rehearing, we deny the motion; however, we vacate and withdraw our April 28, 2010 opinion and judgment, and issue this opinion on rehearing in its place.

This case pertains to agreements between several parties for the development of property at Jackson Palmer Crossing located near the intersection of Business Highway 83 and Jackson Road in McAllen, Texas, and at the northeast corner of 10th Street and Trenton Road, also in McAllen. Appellants, SJW and PCDC, and appellees, SPP, Jackson, PE, and Palmer, complain about a jury verdict in which: (1) SJW was awarded $126,903.73 against SPP and PE and $38,400 against SPP and Jackson for damages associated with appellees' alleged failure to pay commissions owed for bringing tenants to the Jackson Palmer Crossing shopping center; (2) Palmer, individually, was awarded $709,587 in actual damages against SJW and PCDC, $376,397 and $2,000,000 in punitive damages against PCDC and SJW, respectively, associated with Palmer's breach of fiduciary duty and fraud claims; (3) SJW was awarded $55,767.91 in attorney's fees; and (4) appellees were awarded $390,152.23 in attorney's fees for work done at the trial court level, $30,000 for an appeal to this Court, and $30,000 for an appeal to the Texas Supreme Court and $100,570.23 in expenses.

By four issues, SJW and PCDC argue that: (1) SPP had no standing to bring suit and, therefore, its inclusion in the suit did not toll the applicable limitations period; (2) the evidence supporting the jury's finding that SJW and PCDC intentionally interfered with

2

Palmer's alleged contracts is legally and factually insufficient; (3) the trial court erred in assessing exemplary damages against SJW and PCDC; and (4) the trial court erred in awarding Palmer his attorney's fees. By one cross-issue, appellees assert that the evidence supporting the jury's award for damages associated with the commissions is legally and factually insufficient. We affirm, in part, and we reverse and render, in part.

## I. FACTUAL BACKGROUND

### A. The Jackson Palmer Crossing Location

In the early 1990's, Palmer first met Stanley J. Williams and Stanley Jay Williams Jr. ("Jay Williams"), both of SJW.[1] Over the course of a couple of years, Palmer and SJW discussed the development of land that Palmer had acquired from his family near the intersection of Jackson Road and Business Highway 83 in McAllen. Palmer and his companies are involved in the development of various properties in the Rio Grande Valley, while SJW facilitates the development of properties nationwide by acting as a broker and liaison with "big box" retailers, such as Target, Best Buy, and Home Depot, which often serve as anchor tenants for shopping centers.[2] Palmer contracted with SJW to develop the property near the intersection of Jackson Road and Business Highway 83, later named Jackson Palmer Crossing, whereby SJW served as Palmer's broker "in connection with the leasing and sale of the Property." The parties signed an "Exclusive Leasing and Sales Listing Agreement" (the "Listing Agreement") to memorialize the relationship. The Listing Agreement provided that: (1) the commencement of the agreement was June 30, 1999; (2) the agreement expired on June 30, 2000; and (3) Palmer was to pay SJW a 6% sales

---

[1] Stanley J. Williams is the father of Stanley Jay Williams. The record reflects that Stanley Jay Williams, also known as Jay Williams, owns and controls SJW and PCDC while Stanley Williams serves as a retired consultant. Stanley Williams testified at trial that he is consulted by Jay Williams about deals involving SJW and PCDC "about every hour."

[2] Palmer owns and operates SPP, Jackson, and PE.

3

commission, a 4% commission for "total lease rental for the primary term (years 1-10)" and a 2% commission "of the total rental for the primary term (years 11-20) of each lease if Broker is the sole source of tenant."

During the original term of the Listing Agreement, SJW allegedly secured Fashion Bug and Staples as tenants in the shopping center at Jackson Palmer Crossing.[3]  The record reflects that, on July 3, 2000, a couple days after the Listing Agreement supposedly expired, SJW secured Factory 2-U as a tenant in the Jackson Palmer Crossing shopping center.  The record also includes a letter sent by Palmer to SJW on July 6, 2000, requesting that the term of the Listing Agreement be extended an additional thirty days from the June 30, 2000 expiration date.  In response to Palmer's July 6, 2000 request, SJW sent another Listing Agreement to Palmer extending the term from June 30, 2000 to June 30, 2001; however, this agreement was signed by Jay Williams, as president of SJW, but it was not signed by Palmer.

## C.    The 10th Street and Trenton Location

### 1.    Palmer's Allegations

At some point during the transactions pertaining to the Jackson Palmer Crossing shopping center, Palmer alleges that he began discussing a second development project with Stanley and Jay Williams.  The second development project was located at the northeast corner of 10th Street and Trenton Road in McAllen (the "Trenton Project").  At the beginning of the project, the property was primarily farmland; however, a small portion of the land already had a gas station and a McDonald's restaurant situated on it.  Palmer

---

[3] Additionally, pursuant to a "Development Consultant Agreement" between Palmer and Property Commerce Management Company, SJW, after contracting several different "big box" retailers, was able to secure Home Depot as the anchor tenant at the Jackson Palmer Crossing shopping center.  As a result of its efforts, SJW was paid a $74,100 development fee by Palmer.  The "Development Consultant Agreement" is not disputed in this case.

4

further alleges that, when he began discussing the second development project with Stanley and Jay Williams, he asked them to continue to act as his broker and they agreed to do so. No contract was signed to memorialize the purported brokerage agreement.

In any event, Palmer asked his friend, Butch Schwartz, a local realtor, to begin assembling the property at the northeast corner of 10th Street and Trenton. Schwartz was familiar with the property because he sold portions of the tracts to the existing owners, and he was listing the tracts for sale. Among the tract owners were B.R. Whisenant; Wayne and Gelee Allen; Bill and Opal Baldwin; Yvonne Robinson; Harlon and Mary Robinson; and Michael Kilgore, M.D. Most of the tract owners were descendants of the Robinson family.

Palmer states that, in 1998, SJW began providing "key services" for him in the development of the Trenton Project. According to Palmer, SJW contacted several of the same "big box" retailers that it had previously contacted for the Jackson Palmer Crossing development. Among the retailers contacted by SJW on Palmer's behalf was Albertson's grocery store; however, Albertson's initially declined to participate.

Palmer notes that he regularly attends an annual convention in Las Vegas conducted by the International Counsel of Shopping Centers ("ICSC"). Palmer recalled that, in 1999, he was invited to the ICSC convention by Stanley and Jay Williams to discuss the Trenton Project at Le Montrachet, a restaurant located in the Las Vegas Hilton Hotel. Whisenant and his wife accompanied Palmer and his wife to the 1999 ICSC convention to meet with Stanley and Jay Williams at Le Montrachet to discuss the Trenton Project.

Palmer also recalls that Jay Williams and Clay Trozzo, a broker for PCDC and SJW and Jay Williams's brother-in-law, invited Palmer to go hunting in Encino, Texas, so that the parties could discuss progress on the Trenton Project. Jay Williams and Trozzo

5

allegedly explained to Palmer that Albertson's was again interested in being the anchor tenant for the Trenton Project, so Steve Jarvios, an Albertson's representative, was invited to hunt as well. However, upon arriving, Jarvios explained to the parties that he had just resigned from Albertson's and that he was now working for Lowe's Home Improvement Centers. Despite this disclosure, the parties allowed Jarvios to stay and hunt with them.

Later, the parties discovered that Albertson's was no longer interested in the site, so Jay Williams and Trozzo began searching for a new anchor tenant for the property. Eventually, Jay Williams and Trozzo were able to interest Target, a long-time client of SJW, in the location. On March 15, 2000, Trozzo allegedly sent Schwartz and Palmer a letter of intent, indicating that PCDC intended to purchase, on Palmer's behalf, 13.34 acres at the northeast corner of 10th Street and Trenton from the landowners for $2.3 million and that Palmer would be responsible for paying SJW a 6% commission from the total sales price. Essentially, the purchase of the tracts of land for $2.3 million would create one large tract of land with one owner, Palmer, who would then sell the land to Target for development of a store and possibly an attached shopping center.

On March 17, 2000, Palmer sent Trozzo a letter of intent to sell approximately 18.85 acres of land located at the northeast corner of 10th Street and Trenton to SJW for $4.9 million, plus a 6% broker's commission for SJW. At this time, Palmer did not have any of the land under contract; however, he apparently intended to assemble the land via earnest money contracts to sell the land to SJW who would, in turn, sell the land to Target for development. On March 21, 2000, Trozzo, acting as a representative of PCDC, countered Palmer's offer with a letter of intent to purchase 13.34 acres of the property from Palmer for $2.6 million plus a 6% commission for SJW.

In light of his discussions with SJW and PCDC, Palmer began approaching the

owners of the tracts in an attempt to assemble the land through earnest money contracts. The process of assembling land for future development is a delicate process that requires speed, secrecy, and timing. Palmer signed earnest money contracts with the landowners.[4] Most of the contracts: (1) provided for a 120-to-150-day "feasibility period"; (2) gave Palmer the exclusive right to purchase the property; and (3) expired on April 15, 2000.[5] Palmer was able to assemble all of the necessary tracts of land, except for one—a 3.7-acre tract owned by Dr. Kilgore.[6] Palmer's failure to secure an earnest money contract from Dr. Kilgore severely jeopardized the Trenton Project because Dr. Kilgore's tract was situated in such a way that prevented Palmer from selling the package of land to Target for further development.

As negotiations proceeded in the assembly of the tracts for presentment to Target, Stanley and Jay Williams invited Palmer to the 2000 ICSC conventions to further discuss the Trenton Project. At the 2000 ICSC convention, Palmer updated Stanley and Jay Williams as to the progress of his negotiations with the landowners. In these discussions, Palmer conveyed confidential price information and acknowledged that he did not have Dr.

---

[4] Palmer executed earnest money contracts with: (1) B.R. Whisenant for 1.99 acres for $467,712.50, or, in other words, $10 per square foot; (2) Wayne and Gelee Allen for 1.07 acres; (3) Bill and Opal Baldwin for 2.36 acres for $282,277 or, in other words, $2.75 per square foot; (4) Yvonne Robinson for 3.81 acres for $414,635, or, in other words, $2.50 per square foot; and (5) Harlon and Mary Robinson for 5.82 acres for $532,362, or, in other words, $2.10 per square foot. The record does not contain a contract for Wayne and Gelee Allen executed at the time of the others; however, Wayne testified via deposition that he and his wife did execute an earnest money contract with Palmer at this time. Moreover, testimony was adduced at trial as to the discrepancy in the prices for each tract of land. Real estate experts testified that the price of a tract of land is dependant upon how it is situated in relation to streets or areas of high traffic. Whisenant received a higher offer than the others because his land is situated nearest to the corner of 10th Street and Trenton, a heavy traffic area, while the other tracts are situated further away from the intersection.

[5] The April 15, 2000 expiration date was allegedly extended by agreement with the landowners and Palmer. Testimony at trial reveals that the landowners granted Palmer an additional 180 days to determine the feasibility of the Trenton Project.

[6] Dr. Kilgore testified at trial that Palmer and the other landowners approached him several times in order to coax him to sell the land to Palmer; however, Dr. Kilgore ignored most of the communications and insisted on dealing directly with Target rather than any middlemen or local relators and land purchasers.

Kilgore under contract. According to Palmer, Trozzo, after learning that Palmer was unable to secure an earnest money contract with Dr. Kilgore, got Dr. Kilgore to sign a letter of intent on June 6, 2000, indicating that PCDC would purchase Dr. Kilgore's land and that SJW would receive a 6% brokerage commission.[7] However, Trozzo repeatedly informed Palmer that Dr. Kilgore was not under contract, even though he really was, and never once told Palmer that Dr. Kilgore intended to sell his property to SJW and PCDC.

The landowners secured by Palmer's earnest money contracts began to worry about whether the project would be completed as the expiration date of Palmer's earnest money contracts neared. Palmer contacted Trozzo to relay additional pricing information that he had received, inform Trozzo that his earnest money contracts were expiring, and to request a letter of intent from Dr. Kilgore indicating that he was going to sell his property to SJW or PCDC.[8] At this time, Palmer believed that: (1) SJW and PCDC were working as his broker to get Dr. Kilgore under contract; and (2) by showing the landowners that he had a letter of intent from Dr. Kilgore, the landowners would elect to extend their contracts with Palmer and allow the Trenton Project to come to fruition. Jay Williams informed Palmer that Dr. Kilgore was not under contract and that no assurances would be provided. Around this time, several of the landowners attempted to contact Dr. Kilgore to inquire about the status of his property so that the Trenton Project could be completed. In fact, Wayne Allen wrote an impassioned letter to Dr. Kilgore and even visited Dr. Kilgore's office, masquerading as a walk-in patient in order to ask Dr. Kilgore about what it would take to complete the deal. Wayne and the other landowners were consistently rebuffed and ignored by Dr. Kilgore, who was apparently under contract with PCDC at this time.

_____

[7] As a part of his deal with PCDC, Dr. Kilgore was offered $1,128,204 for his 3.7-acre tract.

[8] The record contains several letters from Palmer addressed to Trozzo, requesting information regarding the purchasing of Dr. Kilgore's tract of land and stating that time was of the essence.

Shortly before Palmer's earnest money contracts expired, Trozzo approached the landowners to inquire about whether the landowners were still under contract. Trozzo's efforts were memorialized in one such letter, dated September 7, 2000, to Harlon and Mary Robinson which stated the following: "Thank you for the opportunity to meet you in McAllen, Texas[,] last week. We did not realize your property on Trenton was currently under contract with another party. We hope that all goes well with your transaction and you [] reach your goals with your sale." Palmer alleges that Trozzo, SJW, and PCDC were aware at all times of the existence of his earnest money contracts with the landowners and that Trozzo's meeting with the landowners was for the purpose of inducing the landowners to breach Palmer's earnest money contracts so that SJW and PCDC could get the landowners under contract and package the land for sale to Target themselves.[9]

On September 6, 2000, Opal Baldwin sent Palmer a letter stating the following: "Please be advised that for various reasons, including Paragraph 5 of the Unimproved Property Commercial Contract, Mrs. Baldwin considers the contract concerning her property as _terminated_ and _null and void_." (Emphasis in original.) Subsequently, on September 8, 2000, Harlon and Mary Robinson sent Palmer a similarly-worded letter terminating their contract with Palmer. On September 13, 2000, Trozzo, on behalf of PCDC, sent Palmer a letter requesting proof that Palmer had "control of the Property" by providing PCDC with copies of "receipted contracts with the title company." Trozzo also noted that Palmer's failure to provide copies of the contracts would result in SJW and

---

[9] Wayne Allen testified via deposition that he and the other landowners were approached by SJW and PCDC while the landowners were still under contract with Palmer. The landowners were encouraged by SJW and PCDC to break their contracts with Palmer; however, several of the landowners refused to do so because they did not desire to do business with SJW and PCDC. Dr. Kilgore testified via deposition that he was approached by Trozzo, who represented that he was from Target rather than SJW or PCDC. Dr. Kilgore had previously informed all parties that he preferred to deal directly with Target representatives. In any event, Dr. Kilgore recalled a conversation he had with Trozzo where Trozzo noted that Palmer was trying to assemble the tracts of land for development but Trozzo wanted to get Dr. Kilgore under contract and wait until Palmer's earnest money contracts expired so that SJW and PCDC could develop the land themselves.

PCDC dealing directly with the landowners.

After receiving the various termination letters and Trozzo's September 13, 2000 letter, Palmer believed that "he had been betrayed." Thus, in response to Trozzo's September 13, 2000 letter, Palmer sent Trozzo, SJW, and PCDC a letter stating that: (1) they had tortiously interfered with Palmer's earnest money contracts with the landowners; (2) as a result of the interference and accompanying delay in the development process, "[y]our [Trozzo, SJW, and PCDC] actions have tarnished my reputation as a developer in the community and have resulted in substantial financial loss to me"; and (3) "[y]our letter of September 13, 2000 appears to be nothing more that a self-serving attempt to disguise the damage you have caused." In response to SJW and PCDC's purported actions, Palmer began to withhold commissions from Jackson Palmer Crossing, thinking that it was not fair to pay the commissions when SJW and PCDC had betrayed him. Palmer also refused to renew the Listing Agreement he had with SJW at Jackson Palmer Crossing.

Now believing that SJW and PCDC were acting counter to his interests, Palmer hired Trammell Crow Company as his new broker on the Trenton Project, and they convinced the landowners to renew their earnest money contracts with Palmer in hopes of packaging the land to Target or another anchor tenant.[10] However, shortly thereafter, Target, Home Depot, and SJW allegedly pressured Trammell Crow to stop acting as Palmer's broker. Target then instructed the landowners to deal directly with SJW and PCDC, rather than Palmer.

Later, Jarvios, now with Lowe's, informed the landowners that Lowe's would be interested in developing the site. Using this information, Palmer was able to secure another 180-day contract with the landowners. At some point, Jarvios allegedly received

_____

[10] During its representation of Palmer, Trammell Crow sent a letter to Schwartz regarding the Trenton Project, which stated: "Furthermore, in the presence of Home Depot, Jay Williams assured us [Trammell Crow] that he would assign the Doctor's contract to us if Jay Palmer pays to Property Commerce commissions allegedly owed to them for two (2) deals that were completed at Jackson Palmer Crossing."

an "aggressive and irate" phone call from a Target representative attempting to prevent Lowe's from developing the site. Jarvios proposed that Lowe's and Target work together to develop the site; however, SJW and PCDC could not be involved because SJW and PCDC also represented Home Depot, one of Lowe's competitors. Target did not respond to Jarvios's proposal.

In May 2001, Stanley Williams called Palmer and proposed a meeting to try to work out the problems associated with the Trenton Project. Palmer agreed to meet as long as Trozzo and Jay Williams were not involved in the deal because Palmer believed that Trozzo and Jay Williams were the main perpetrators of the earlier deception. Palmer's sentiments regarding Trozzo and Jay Williams were also echoed by the landowners. After meeting with Stanley Williams, Palmer agreed to assign the landowners' property that he had under contract to Target for no profit. In exchange for this assignment, Palmer received a conditional reciprocal easement agreement ("REA"). The REA was conditioned on Palmer purchasing at least ten acres of land to the north of the Trenton Project owned by Eugene J. Kayser Jr. within twelve months. At the time of the negotiations with Stanley Williams, Palmer notes that he was already in the midst of negotiations with Kayser to develop the tract of land adjoining the Trenton Project. The REA was valuable to Palmer because it allowed for traffic to cross parts of the Target property to access land to the north of the Trenton Project, where the Kayser tract is situated. Without the REA, Palmer would have had a very difficult time marketing and developing the Kayser tract, as access to the land would be impeded. Palmer alleges that Stanley Williams knew that the REA was crucial to Palmer's development of the Kayser tract and that Stanley Williams used the REA as leverage to obtain the assignment of the landowners' property with no markup.

Palmer later discovered that, despite his insistence on Trozzo not being involved in

11

the renewed negotiations with SJW and PCDC, Trozzo was indeed involved in the transactions and that Trozzo's involvement had been hidden from Palmer from May to December 2001. Trozzo, on behalf of SJW, attempted to purchase the Kayser tract for $3 million, which was significantly more than the $1,960,000 bid Palmer had previously made. Palmer believed that SJW's $3 million bid for the Kayser tract was an attempt by SJW to bid up the price of the Kayser tract to prevent Palmer from purchasing the tract and, therefore, rendering the REA meaningless. In addition, Palmer found out that Stanley and Jay Williams formed a single-asset entity, McAllen Shopping Center, Ltd., and acquired a portion of the Trenton Project for their own development. This portion of the Trenton Project was eventually sold by SJW to Chick-Fil-A.[11]

In the end, the Trenton Project was developed with Target being the anchor tenant. Target purchased the property for a sum significantly less than what had been previously offered. As a result of SJW and PCDC's actions, Palmer alleges that he was prevented from making a profit on the assembly of the land tracts for Target and that SJW and PCDC bid up the price of the Kayser tract so as to prevent the negotiated REA from having any value whatsoever.

## 2.   The Trenton Project According to SJW and PCDC

SJW and PCDC, on the other hand, allege that they first learned about the development opportunities at the northeast corner of 10th Street and Trenton in 1999 or 2000, when they drove by the property and saw Schwartz's sign listing the property for sale. After viewing Schwartz's sign listing the property for sale, SJW and PCDC made several inquires and offers to purchase the land. In particular, SJW and PCDC obtained

---

[11] Palmer referenced an email in his testimony from Charles Thompson, an architect for SJW, regarding the Trenton Project. In his email, Thompson instructed Larry Heimer, a civil engineer doing work at the Trenton Project, to: "Do not send Jay Palmer a plan showing the lease space next to Target and/or the Chick-[F]il-A plan. [SJW] Property Commerce does not want him having that information."

12

a letter of intent from Dr. Kilgore regarding the sale of his land to SJW and PCDC. SJW and PCDC then began to assemble the properties on their own for future sale to Target. SJW and PCDC argue on appeal that PCDC was never a party to any of the transactions in question and that, because the record does not contain a writing evidencing a brokerage agreement between SJW and Palmer similar to the Jackson Palmer Crossing development, neither SJW nor PCDC were Palmer's broker for Palmer's Trenton Project. Instead, SJW and PCDC recalled that they competed with Palmer in developing the northeast corner of 10th Street and Trenton. However, the record reflects that Trozzo, Jay Williams, and Stanley failed to explicitly tell Palmer that neither SJW nor PCDC were Palmer's broker in the development of Palmer's Trenton Project. SJW and PCDC also allege that the earnest money contracts Palmer had with the landowners were null and void because Palmer failed to deposit earnest money with the title company.[12] Moreover, SJW and PCDC argued at trial that because the record did not contain a copy of all the contracts Palmer had with the landowners, Palmer could not recover any damages on the contracts not admitted into evidence. Furthermore, throughout the course of this case, SJW and PCDC have denied any wrongdoing regarding the Trenton Project and attributed Opal Baldwin's and Harlon and Mary Robinsons' termination of their contracts with Palmer to coincidence.

## II. PROCEDURAL HISTORY

On December 2, 2003, SJW filed its original petition against SPP, Jackson, PE, and

---

[12] The record reflects that Palmer tendered earnest money for the contracts contained in the record; however, the contracts do not reflect that the title company received the earnest money. In other words, the earnest money does not appear to be "receipted" by the title company. Palmer testified that he provided Schwartz with the earnest money that was to be provided to the title company. Schwartz noted that he received the earnest money, thus corroborating Palmer's testimony regarding the earnest money; however, Schwartz could not recall as to why the earnest money was not deposited with the title company. In any event, the landowners never sought to terminate their contracts with Palmer until they were approached by SJW and PCDC.

Palmer, individually, (collectively the "Palmer companies") alleging a breach of contract action for commissions owed under the "Listing Agreement" pertaining to properties located at Jackson Palmer Crossing. In this filing, SJW argued that Jackson and PE were both assigns of SPP and that Palmer was the owner of all of the entities and, therefore, liability was attributable to all of the named entities. On February 9, 2004, the Palmer companies filed an original answer and counterclaim: (1) denying the allegations made by SJW in its original petition; (2) asserting various affirmative defenses, including Jackson, PE, and Palmer were not liable in the capacity in which they were sued; and (3) asserting counterclaims for breach of fiduciary duty, malicious interference with contract and prospective business relations, and fraud against SJW pertaining to an implied agency relationship regarding transactions at the Trenton Project.

SJW filed its first amended petition on May 13, 2004, asserting the same causes of action as contained in its original petition and adding an additional common-law fraud cause of action against Palmer, individually. Subsequently, on November 8, 2005, the Palmer companies filed their first amended answer and counterclaim: (1) generally denying the allegations contained in SJW's first amended petition; (2) asserting various affirmative defenses, including laches; (3) arguing, by verified plea, that Jackson was not liable in the capacity it was sued; (4) requesting attorney's fees pursuant to article 6.04 of the Listing Agreement[13]; (5) invoking the statutory damage caps enumerated in chapter 41 of the civil practice and remedies code; (6) re-asserting their breach of fiduciary duty,

---

[13] Article 6.04 of the Listing Agreement provides, as follows:

6.04    If either party hereto shall institute any action or proceeding against the other party hereto relating to this Agreement, the successful party in such action or proceeding shall be entitled to recover from the unsuccessful party all fees and expenses incurred in connection therewith, including court costs, reasonable attorneys' fees and related expenses.

tortious interference with contract and prospective business relations, and fraud causes of action and noting that SJW owed Palmer "fiduciary duties of loyalty, good faith, integrity of the strictest kind, fair and honest dealing, and the duty not to advance self-interest"; (7) substituting Palmer as "Counter-Plaintiff"; and (8) requesting exemplary damages.

On June 23, 2006, the Palmer companies filed a second amended answer and counterclaim, adding PCDC as a third-party defendant and asserting an additional counterclaim against both SJW and PCDC for negligent misrepresentation. On September 11, 2006, the Palmer companies filed their third amended answer and counterclaims, arguing that: (1) because the Listing Agreement failed to identify the property with sufficient certainty, the Listing Agreement does not sufficiently establish that SJW and PCDC were owed commissions; and (2) because SJW and PCDC breached its duties of loyalty and good faith owed to the Palmer companies, SJW and PCDC's claims were barred.

SJW filed its second amended petition on September 15, 2006: (1) re-asserting its breach of contract and common-law fraud causes of action against the Palmer companies; (2) alleging that the actions of the Palmer companies amounted to civil conspiracy; and (3) requesting exemplary damages. Also on September 15, 2006, SJW and PCDC filed separate original answers: (1) denying the assertions contained in the Palmer companies' pleadings; (2) asserting various affirmative defenses, including limitations; and (3) requesting attorney's fees pursuant to article 6.04 of the Listing Agreement.

Later, on November 28, 2006, SJW filed its third amended petition, adding a statutory fraud cause of action against the Palmer companies. On February 13, 2007, the Palmer companies filed their fourth amended answer and counterclaims, which mirrored their third amended answer and counterclaims and also specifically denied that SJW was

15

entitled to commissions related to the lease to Factory 2-U. SJW and PCDC filed a second amended original answer on April 10, 2007.

On April 16, 2007, the trial on this matter commenced. After SJW and PCDC rested their case-in-chief, the trial court granted a directed verdict as to SJW and PCDC's common-law fraud claim, leaving only SJW and PCDC's breach of contract claim and the Palmer companies' counterclaims to be determined by the jury.[14] After several days of testimony and the admission of hundreds of exhibits, the jury entered a split verdict. In particular, the jury concluded the following:

THE COURT: The first—Question No. 1: Did the following agree to pay SJW Property Commerce, Inc. a commission to [the] Staples lease? Southwest Pinnacle [Properties], Inc., yes; Palmer Enterprises, Inc., yes.

Question No. 2: Did the following agree to pay SJW Property Commerce, Inc. a commission to [the] Fashion Bug lease? A. Southwest Pinnacle Properties, yes; Jackson I Corp., yes.

[Question No. 3:] Did Southwest Pinnacle Properties agree to pay SJW Property Commerce, Inc. a commission on Factory 2-U lease? Answer: No.

Did the following fail—Question No. 4: Did the following fail to comply with their agreement regarding the commission to Staples lease Southwest Pinnacle Properties? Answer: Yes. Palmer [Enterprises], Inc., yes.

Question No. 5: Did the following fail to comply with [the] agreement regarding commission on the Fashion Bug Lease? Southwest Pinnacle Properties, yes; Jackson I Corp., yes.

Was—Question No. 7: Was Southwest Pinnacle Properties, Inc.'s failure to comply excused? Answer: No.

---

[14] The record reflects that SJW and PCDC abandoned their civil conspiracy cause of action against SPP, Jackson, PE, and Palmer. Moreover, SJW's statutory fraud claim was dismissed earlier in the case.

16

Question No. 8: Was Palmer Enterprise[s], Inc.'s failure to comply excused? Answer to the Question No. 8: No.

Was—Question No. 9: Was Jackson I Corp.'s failure to comply excused? Answer: No.

Was G.J. Palmer's failure to comply excused—Question No. 10. Answer: No.

What sum of money if paid—if any, if paid now in cash would fairly and reasonably compensate SJW Property Commerce for damages, if any, that were proximately caused by such conduct? Past commission owed to Staples lease, $128,903.72; commission owed to Fashion Bug lease, $38,400.

Question No. 12: Did a relationship of trust and confidence exist between Southwest—SJW Property Commerce, Inc. and G.J. Palmer as to North 10th & Trenton? Answer: Yes.

Question No. 13: Did [SJW] Property Commerce, Inc. comply with its fiduciary duty to G.J. Palmer, Jr.? Answer: No.

[Question No. 14:] Did [SJW] Property Commerce, Inc. intentionally interfere with G.J. Palmer's earnest money contracts, if any? A. [W]ith Opal Baldwin, yes; B. [W]ith B.W.—B.R. Whisenant, yes; C. [W]ith Wayne Allen and [Gelee] Robinson Allen, yes; D. [W]ith Yvonne Robinson, yes; E. [W]ith Harlon and Mary Robinson, yes; and F. [W]ith Eugene Kayser[, yes].

Question No. 15: Did [SJW] Property [Commerce] interfere because it has a good-faith belief it has a right to do so? A. [N]o; B. [N]o; C. [N]o; D. [N]o; E. [N]o; F. [N]o.

. . . .

[Question No. 18:] What date should G. Palmer in the exercise of reasonable diligence have discovered the interference of the contracts of SJW Property Commerce? Answer with was [sic] a date in the back.

17

August 8th, 2000.

Question No. 19: Did [SJW] Property Commerce, Inc. commit fraud against G.J. Palmer, Jr.? Answer: Yes.

. . . .

Twenty-one: By what date should G. Palmer in [the] exercise of reasonable diligence have discovered the fraud of [SJW] Property Commerce, Inc.? Answer: September 8, 2000.

[Question No. 22:] What sum of money, if paid now in cash, would fairly and reasonably compensate G.J. Palmer, Jr. for his damages, if any, that were proximately caused [by SJW Property Commerce's] conduct? A. The lost profit from the Robinson tract deal, answer $376,397. B. [L]ost profits from the rental revenue delay $207,926. And lost profit from the property sale delay $125,264.[15]

Question No. 23: Do you find by clear and convincing evidence that the harm to G.J. Palmer, Jr. resulted from malice [regarding PCDC's purported actions]? Answer: Yes.

[Question No. 24:] What sum of money, if paid now in cash, would—should be assessed against Property Commerce Development [PCDC] and awarded to G.J. Palmer as exemplary damages, if any, for the conduct found in response to a Question No. [2]3? And it's $376,397.

Question No. 25: Do you find by . . . clear and convincing evidence that the harm to G.J. Palmer, Jr. resulted from malice [regarding SJW's purported actions]? Answer: Yes.

Number 26: What sum of money, if any, if paid

---

[15] The sum of the figures mentioned in the jury's answer to question number 22 is $709,587. The trial court, in its final judgment, stated that SJW and PCDC were jointly and severally liable for the $709,587 in actual damages awarded by the jury in question number 22. *See Kinzbach Tool Co., Inc. v. Corbett-Wallace Corporation*, 138 Tex. 565, 160 S.W.2d 509, 514 (1942) (holding that wrongdoers may be held jointly and severally liable if the victim establishes that only one breached a fiduciary duty owed to the victim and that the other knowingly participated therein); *see also Jung Fu Chien v. Chen*, 759 S.W.2d 484, 487 (Tex. App.––Austin 1988, no writ) (same).

18

> now in cash should be assessed against [SJW] Property Commerce, Inc. and awarded to G.J. Palmer, Jr. as exemplary damages, if any . . . . Answer: $2 million dollars.

At the conclusion of the trial, the parties filed various post-judgment motions, including motions to disregard various portions of the jury's verdict and a motion notwithstanding the jury's verdict. These motions were ostensibly denied when the trial court entered its final judgment adopting the jury's findings on February 7, 2008.[16] On March 6, 2008, SJW filed a motion for new trial, a motion to modify the judgment, and a motion for remittitur, asserting, among other things, that: (1) the evidence supporting the damages awarded to Palmer was insufficient; (2) the amount of attorney's fees awarded to Palmer's attorneys required modification; and (3) limitations barred all claims brought by the Palmer companies. In response to SJW's March 6, 2008 motions, the Palmer companies filed their own motion for new trial, arguing that the evidence supporting the jury's verdict as to the commissions owed to SJW was insufficient. SJW's March 6, 2008 motions and the Palmer companies' motion for new trial were overruled by operation of law. *See* TEX. R. CIV. P. 329b(c). SJW and PCDC filed a notice of appeal, and the Palmer companies responded by filing a notice of cross-appeal.

### III. STANDING AND TOLLING OF THE LIMITATIONS PERIOD

In their first issue, SJW and PCDC assert that SPP did not have standing to assert its February 9, 2004 counterclaims against SJW and PCDC because SPP "was not damaged with respect to any actions at 10th Street and Trenton Road." SJW and PCDC further assert that even if SPP did have standing, its causes of action do not constitute a

---

[16] In its February 7, 2008 final judgment, the trial court noted that the parties had submitted affidavits with the attorney's fees requests and subsequently awarded SJW $55,767.91 in attorney's fees and the Palmer companies $289,582 in attorney's fees and $100,570.23 in expenses.

counterclaim and are, instead, a third-party action that is barred by limitations. SJW and PCDC also argue that SPP's counterclaim did not arise out of SJW's claim for commissions. The Palmer companies counter by arguing that SPP had standing to sue and that limitations did not bar the Palmer companies' counterclaims because SPP was an aggrieved party and the Palmer companies' counterclaims were brought in accordance with sections 16.068 and 16.069 of the civil practice and remedies code. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 16.068, 16.069 (Vernon 2008).

## A.    Applicable Law

### 1.    Standing and Capacity

A plaintiff must have both standing and capacity to bring a lawsuit. *Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 848 (Tex. 2005) (citing *Coastal Liquids Transp., L.P. v. Harris County Appraisal Dist.*, 46 S.W.3d 880, 884 (Tex. 2001)). The standing inquiry "focuses on whether a party has a sufficient relationship with the lawsuit so as to have a 'justiciable interest' in its outcome, whereas the issue of capacity 'is conceived of as a procedural issue dealing with the personal qualifications of a party to litigate.'" *Id.* (quoting 6A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 1559, at 441 (2d ed. 1990)). A plaintiff has standing when he is personally aggrieved, regardless of whether he is acting with legal authority; a party has capacity when it has the legal authority to act, regardless of whether it has a justiciable interest in the controversy. *See Nootsie, Ltd. v. Williamson County Appraisal Dist.*, 925 S.W.2d 659, 661 (Tex. 1996) (holding that the standing doctrine requires that there be (1) "a real controversy between the parties," that (2) "will be actually determined by the judicial declaration sought"). The complained-of injury "must be concrete and particularized, actual or imminent, not hypothetical." *DaimlerChrysler Corp. v. Inman*, 252 S.W.3d 299, 304-05

(Tex. 2008) (footnotes omitted); *see Tex. Lottery Comm'n v. Sci. Games Int'l*, 99 S.W.3d 376, 380 (Tex. App.–Austin 2003, pet. denied) (holding that "[t]o establish standing, one must show a justiciable interest by alleging an actual or imminent threat of injury peculiar to one's circumstances and not suffered by the public generally"); *see also Elizondo v. Tex. Natural Res. Conservation Comm'n*, 974 S.W.2d 928, 932 (Tex. App.–Austin 1998, no pet.) (citing *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975) (noting that the general standard for determining whether plaintiff has standing is whether she has such a personal stake in the outcome of the controversy as to warrant invocation of the court's jurisdiction and to justify exercise of the court's remedial powers on her behalf)). Furthermore, standing is implicit in subject-matter jurisdiction and cannot be waived. *See Lovato*, 171 S.W.3d at 849; *see also Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443 (Tex. 1993).

## B.    Discussion

### 1.    SPP's Standing to Bring Its February 9, 2004 Counterclaims

On appeal, SJW and PCDC first argue that there is no evidence in the record demonstrating that SPP was involved in any negotiations for the purchase of property at the northeast corner of 10th Street and Trenton Road; therefore, because the Palmer companies' counterclaims centered on SJW and PCDC's purported conduct regarding Palmer's Trenton Project, SPP did not have a justiciable interest in the matters asserted in the Palmer companies' counterclaims. The Palmer companies counter by arguing that they timely filed their counterclaims and that sections 16.068 and 16.069 of the civil practice and remedies code allowed for the substitution of Palmer as the aggrieved party in place of SPP. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 16.068, 16.069. Moreover, the Palmer companies construe SJW and PCDC's standing argument as a capacity issue that was waived by SJW and PCDC's failure to file a verified plea.

As mentioned earlier, SJW filed its original petition against the Palmer companies on December 2, 2003. Subsequently, on February 9, 2004, the Palmer companies filed their original answer and counterclaims against SJW. However, the Palmer companies identified SPP as the sole "Counter-Plaintiff" in their original counterclaims. In their first amended counterclaims filed on November 8, 2005, the Palmer companies amended their counterclaims to replace SPP with Palmer as "Counter-Plaintiff." No new causes of action were asserted in the Palmer companies' November 8, 2005 amended counterclaims.

SJW and PCDC correctly state that SPP was not involved in any negotiations regarding the development of Palmer's Trenton Project, which is the basis of the Palmer companies' counterclaims. SJW and PCDC argue that SPP was a proper party to the Jackson Palmer Crossing dispute but not to the Trenton Project dispute. However, after viewing the entire record, we find that the claims at issue in this case are inextricably intertwined so as to constitute the same transaction or occurrence. Thus, even though the Palmer companies first named SPP as the "Counter-Plaintiff" in their counterclaims, we find that SPP had a justiciable interest in this matter and, therefore, had standing.

In arriving at our conclusion, we first determine what constitutes a "transaction." To determine whether a set of facts constitutes a "transaction," we employ the logical relationship test, which examines whether the essential facts on which the claims are based are significantly and logically relevant to both claims. *Wells v. Dotson*, 261 S.W.3d 275, 281 (Tex. App.–Tyler 2008, no pet.) (citing *Cmty. State Bank v. NSW Invs.*, 38 S.W.3d 256, 258 (Tex. App.–Texarkana 2001, pet. dism'd w.o.j.) (considering the term "transaction" in determining whether a counterclaim was compulsory); *see Smith v. Ferguson*, 160 S.W.3d 115, 120 (Tex. App.–Dallas 2005, pet. denied). "Under this test, a transaction is flexible, comprehending a series of many occurrences logically related to

22

one another." *Wells*, 261 S.W.3d at 281 (citing *NSW Invs.*, 38 S.W.3d at 258; *Klein v. Dooley*, 933 S.W.2d 255, 259 (Tex. App.–Houston [14th Dist.] 1996), *rev'd on other grounds*, 949 S.W.2d 307 (Tex. 1997)). "There is no logical relationship when none of the same facts are relevant to both claims. However, whenever the same facts, which may or may not be disputed, are significant and logically relevant to both claims, the 'logical relationship' test is satisfied." *Jack H. Brown & Co. v. Nw. Sign Co.*, 718 S.W.2d 397, 400 (Tex. App.–Dallas 1986, writ ref'd n.r.e.).

Here, Palmer testified that the alleged brokerage relationship between himself and SJW arose as a result of their dealings at the Jackson Palmer Crossing shopping center where SPP was a signatory to the Listing Agreement. Several witnesses testified that SJW acted as Palmer's broker at both the Jackson Palmer Crossing project and the Trenton Project. Furthermore, even SJW admits that it and Palmer engaged in numerous conversations regarding the development of both sites at around the same point in time. Finally, we find it particularly noteworthy that Jay Williams informed Trammell Crow, Palmer's one-time broker, that "if Jay Palmer pays to [SJW] Property Commerce commissions allegedly owed to them for two (2) deals that were completed at Jackson Palmer Crossing," SJW and PCDC would "assign [Dr. Kilgore's] contract to [Palmer]." As noted earlier, Dr. Kilgore's contract exclusively involved Palmer's Trenton Project. Therefore, the statement made by Jay Williams to Trammell Crow indicates that SJW and PCDC viewed the disputes at Jackson Palmer Crossing and at 10th Street and Trenton Road as inextricably intertwined. Because the record supports a finding that the claims in dispute are logically related, we conclude that SPP had a justiciable interest in the outcome of this matter and, thus, was aggrieved; as such, we cannot say that SPP lacked standing

23

to assert its February 9, 2004 counterclaims.[17]

### 2. The Substitution of Palmer as "Counter-Plaintiff"

Despite concluding that SPP had standing to assert its counterclaims, we do not believe that SPP had the capacity to sue SJW and PCDC for damages sustained at the Trenton Project because SPP was not a party to the negotiations pertaining to the Trenton Project. *See Nootsie, Ltd.*, 925 S.W.3d at 661 (defining "capacity" as the legal authority to act, regardless of whether it has a justiciable interest in the controversy). Realizing that SPP lacked the capacity to sue for damages associated with the Trenton Project, the Palmer companies substituted Palmer as the proper "Counter-Plaintiff" without asserting any new causes of action. *See Carter v. DeJarnatt*, 523 S.W.2d 88, 91 (Tex. App.–Texarkana 1975, writ ref'd n.r.e.) (concluding that suit was not barred by limitations where the amended petition, which was filed after the expiration of the limitations period, did not change the cause of action but, rather, changed the capacity in which appellant sued). Texas courts have recognized that a mistake in naming parties to a lawsuit, such as here, constitutes a case of misnomer.

"Misnomer cases are analyzed by asking the following questions: (1) Would a judgment under the original pleading bar recovery under the amended pleading? (2) Would the same evidence support both of the pleadings? (3) Is the measure of damages the same in both pleadings? (4) Are the allegations of each pleading subject to the same defenses?" *Foust v. Estate of Walters*, 21 S.W.3d 495, 501 (Tex. App.–San Antonio 2000, pet. denied) (citing *Phoenix Lumber Co. v. Houston Water Co.*, 94 Tex. 456, 61 S.W. 707,

---

[17] The parties do not challenge whether the Palmer companies' counterclaims were filed within the proper time frame after SJW and PCDC filed their original petition and the Palmer companies filed their original answer. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.069(b) (Vernon 2008). In their appellate brief, the Palmer companies merely state that the counterclaims were timely filed; moreover, SJW and PCDC never address this statement in their response to the Palmer companies' appellate brief.

709 (1901)). "When a party is misnamed, but no one has been misled or disadvantaged by the error in pleading, the relation-back doctrine operates to preserve the claim against a bar of limitations." *Id.* (citing *Dougherty v. Gifford*, 826 S.W.2d 668, 677 (Tex. App.–Texarkana 1992, no writ); *Palmer v. Enserch Corp.*, 728 S.W.2d 431, 434 (Tex. App.–Austin 1987, writ ref'd n.r.e.)). "If the nature of the suit against the defendants remains unchanged, the substitution of parties-plaintiff does not constitute a new suit." *Id.* (citing *Vaughn Bldg. Corp. v. Austin Co.*, 620 S.W.2d 678, 682 (Tex. Civ. App.–Dallas 1981), *aff'd*, 643 S.W.2d 113 (Tex. 1982); *Medford v. Red River County*, 84 S.W.2d 345, 352 (Tex. Civ. App.–El Paso 1935, no writ)). In other words, so long as the purpose and the nature of the claim asserted are clear from the outset, the substitution of a personal representative for a party without capacity does not introduce a new or different cause of action and the substitution should satisfy the relation-back doctrine. *See Lovato*, 171 S.W.3d at 852-53; *see also Lorentz v. Dunn*, 171 S.W.3d 854, 856 (Tex. 2005).

In the present case, the record demonstrates that Palmer is the president and, therefore, personal representative of SPP. Furthermore, the Palmer companies' first amended answer and counterclaims filed on November 8, 2005, substituted Palmer himself as the proper "Counter-Plaintiff" and advanced the same causes of action against SJW as contained in the Palmer companies' original counterclaims. Neither SJW nor PCDC objected to Palmer's substitution as "Counter-Plaintiff." Moreover, neither SJW nor PCDC demonstrated to the trial court that they were prejudiced or disadvantaged by Palmer's substitution as "Counter-Plaintiff." It is clear to us that Palmer was substituted in place of SPP because SPP lacked the capacity to sue for damages pertaining to the Trenton Project. Based on the record before us, we cannot say that the substitution of Palmer as "Counter-Plaintiff" amounted to a new suit or was improper.

25

### 3. Section 16.069, the Relation-Back Doctrine, and Limitations

Given that we have concluded that Palmer was the proper party to bring suit against SJW for the purported conduct that transpired at the Trenton Project, we must now determine whether the Palmer companies' counterclaims were barred by limitations or whether the limitations period was tolled by sections 16.068 and 16.069 of the civil practice and remedies code, as alleged by the Palmer companies on appeal. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 16.068, 16.069. Here, the Palmer companies alleged that SJW: (1) tortiously interfered with Palmer's earnest money contracts; (2) tortiously interfered with Palmer's prospective business relations with the landowners; (3) breached its fiduciary duty owed to Palmer; and (4) committed fraud. On appeal, SJW and PCDC argue that the Palmer companies' counterclaims were time-barred. SJW and PCDC further argue that the Palmer companies' counterclaims were really third-party actions; thus, section 16.069 of the civil practice and remedies code did not serve to toll the limitations period.

The limitations period for breach of fiduciary duty and fraud is four years. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.004(a)(4)-(5) (Vernon 2002); *see also Willis v. Donnelly*, 199 S.W.3d 262, 278 n.33 (Tex. 2006); *Exxon Corp. v. Emerald Oil & Gas Co.*, No. 05-1076, 2009 Tex. LEXIS 113, at *22 (Tex. Mar. 27, 2009) (citing *Little v. Smith*, 943 S.W.2d 414, 420 (Tex. 1997)). In question number 21, the jury, after considering all the evidence adduced at trial, concluded that Palmer discovered the alleged fraud perpetrated by SJW on September 8, 2000; therefore, the statute of limitations for the Palmer companies' breach of fiduciary duty and fraud causes of action began to run from that date. *See Emerald Oil & Gas Co.*, 2009 Tex. LEXIS 113, at *22 (citing *Little*, 943 S.W.2d at 420) (holding that the limitations period for fraud begins to run from the time the party knew of the misrepresentation). The Palmer companies first asserted their breach of fiduciary duty

and fraud causes of action as to SJW in their original counterclaims filed on February 9, 2004, which was more than six months before the four-year limitations period expired. Thus, the Palmer companies' breach of fiduciary duty and fraud causes of action were timely filed by SPP against SJW. However, in asserting these causes of action, the Palmer companies designated SPP as "Counter-Plaintiff," and we have already concluded that SPP lacked the capacity to bring these causes of action. The substitution of Palmer as "Counter-Plaintiff" did not transpire until November 8, 2005, which was more than one year after the four-year limitations period expired. Absent any tolling of the limitations period, the Palmer companies' breach of fiduciary duty and fraud claims would be time-barred.

However, the Palmer companies argue that the relation-back doctrine tolls the applicable limitations period. Under the relation-back doctrine, as outlined by section 16.068 of the civil practice and remedies code,

> if a filed pleading relates to a cause of action, cross action, counterclaim, or defense that is not subject to a plea of limitation when the pleading is filed, a subsequent amendment or supplement to the pleading that changes the facts or grounds of liability or defense is not subject to a plea of limitation unless the amendment or supplement is wholly based on a new, distinct, or different transaction or occurrence.

TEX. CIV. PRAC. & REM. CODE ANN. § 16.068; *see Brewster v. Columbia Med. Ctr. of McKinney Subsidiary, L.P.*, 269 S.W.3d 314, 317 (Tex. App.–Dallas 2008, no pet.). Section 16.068 is a tolling statute that stops the clock at the time that the original petition is filed, if filed within the limitations period, but cannot toll a time period already expired. *See Almazan v. United Servs. Auto Ass'n*, 840 S.W.2d 776, 779 (Tex. App.–San Antonio 1992, writ denied). This section is designed to protect litigants from loss of their claims by a plea of limitations in cases where that would otherwise occur and, therefore, should be liberally construed. *Milestone Props., Inc. v. Federated Metals Corp.*, 867 S.W.2d 113, 116

27

(Tex. App.–Austin 1993, no writ). "The relation-back doctrine originated as an equitable remedy designed to effectuate justice." *Lovato v. Austin Nursing Ctr., Inc.*, 113 S.W.3d 45, 55 (Tex. App.–Austin 2003), *aff'd*, 171 S.W.3d 845 (citing *Cain v. State*, 882 S.W.2d 515, 518 (Tex. App.–Austin 1994, no writ)). "'It enables the court to arrive at conclusions that will effectuate justice while maintaining simultaneously the appearance of logical consistency.'" *Id.* (quoting *Cain*, 882 S.W.2d at 518).

"The relation-back doctrine has been applied to cure capacity issues, but it cannot retroactively create personal jurisdiction." *Armes v. Thompson*, 222 S.W.3d 79, 84 (Tex. App.–Eastland 2006, no pet.). For example, the Texas Supreme Court has allowed the alleged personal representative in a probate cases to obtain the probate court's permission to represent the estate after litigation had been filed on behalf of the estate. *See Lovato*, 171 S.W.3d at 853-56; *see also Lorentz*, 171 S.W.3d at 856. However, this does not mean "that subsequent pleadings can give the trial court jurisdiction over new parties retroactive to the original filing of the suit." *Armes*, 222 S.W.3d at 84 (citing *Covington v. Sisters of Charity of the Incarnate Word*, 179 S.W.3d 583, 587-88 (Tex. App.–Amarillo 2005, pet. denied)).

Essentially, the relation-back doctrine allows for a party to amend or supplement a pleading changing facts or grounds of liability or even correct capacity issues as long as the original claims were timely filed and the amendments or supplementation do not constitute a "new, distinct, or different transaction or occurrence." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.068; *see also Armes*, 222 S.W.3d at 84. Here, we have already concluded that: (1) the Palmer companies' breach of fiduciary duty and fraud claims were timely filed by SPP against SJW; (2) SPP had standing to file suit against SJW for the purported actions occurring during the development of the Trenton Project; and (3) the

disputes at the Jackson Palmer Crossing shopping center and the Trenton Project were logically related so as to constitute the same transaction or occurrence. Therefore, in applying the relation-back doctrine, we conclude that the Palmer companies' substitution of Palmer as "Counter-Plaintiff," though subject to a plea of limitation on its own, relates back to the original, timely-filed breach of fiduciary duty and fraud counterclaims brought by SPP against SJW. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.068; *see also Armes*, 222 S.W.3d at 84. The Palmer companies were allowed to cure capacity issues in their first amended counterclaims without losing their counterclaims to a plea of limitations. *See Armes*, 222 S.W.3d at 84; *Milestone Props., Inc.*, 867 S.W.2d at 116; *see also Lovato*, 113 S.W.3d at 55. Thus, we hold that the Palmer companies' breach of fiduciary duty and fraud counterclaims were timely filed.

On the other hand, the statute of limitations for tortious interference with an existing contract and prospective business relations is two years. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.003 (Vernon Supp. 2009); *First Nat'l Bank of Eagle Pass v. Levine*, 721 S.W.2d 287, 289 (Tex. 1986) (rejecting that the four-year limitations period applies to a claim for tortious interference with prospective business relations and noting that the two-year limitations period that applies to trespass to property actions also applies to tortious interference with prospective business relations actions); *Gambrinus Co. v. Galveston Bev., Ltd.*, 264 S.W.3d 283, 289 (Tex. App.–San Antonio 2008, pet. denied); *Snell v. Sepulveda*, 75 S.W.3d 142, 144 (Tex. App.–San Antonio 2002, no pet.); *see also Cantu v. Romero, Gonzalez & Benavides, LLP*, No. 04-08-00786-CV, 2009 Tex. App. LEXIS 8241, at *5 (Tex. App.–San Antonio Oct. 28, 2009, no pet.). The jury concluded that Palmer, in the exercise of reasonable diligence, should have discovered SJW's alleged tortious interference with his earnest money contracts on August 8, 2000; thus, the

limitations period began to run from that date. Based on the jury's finding, the limitations period for the Palmer companies' tortious interference with an existing contract and prospective business relations claims as to SJW would have expired on August 8, 2002; thus, the counterclaims would have been time-barred, absent any tolling of the limitations period.

Section 16.069 of the civil practice and remedies states as follows:

(a) If a counterclaim or cross claim arises out of the same transaction or occurrence that is the basis of an action, a party to the action may file a counterclaim or cross claim even though as a separate action it would be barred by limitation on the date the party's answer is required.

(b) the counterclaim or cross claim must be filed not later than the 30th day after the date on which the party's answer is required.

TEX. CIV. PRAC. & REM. CODE ANN. § 16.069. The purpose of section 16.069 "is to prevent a plaintiff from waiting until the adversary's valid claim arising from the same transaction was barred by limitations before asserting his own claim." *Wells*, 261 S.W.3d at 281 (citing *Hobbs Trailers v. J.T. Arnett Grain Co.*, 560 S.W.2d 85, 88-89 (Tex. 1977)).

Here, the Palmer companies' counterclaims as to SJW contain some claims that were brought within the applicable limitations period—the breach of fiduciary duty and fraud claims—and some claims that were not—the tortious interference with contract and prospective business relations claims. We have already concluded that the disputes pertaining to the Jackson Palmer Crossing shopping center and Palmer's Trenton Project are logically related and, thus, constitute the same transaction. No party disputes that the Palmer companies' tortious interference with contract and prospective business relations claims related to Palmer's Trenton Project. Furthermore, SJW and PCDC do not allege that the Palmer companies failed to comply with section 16.069(b)'s timeliness requirement. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.069(b). Therefore, given that

30

the Jackson Palmer Crossing dispute and the Trenton Project dispute constitute a single transaction, we conclude that section 16.069(a) permitted the Palmer companies to assert their tortious interference with contract and prospective business relations claims as to SJW even though such claims would have been time-barred had they been filed separately. *See id.* § 16.069(a).

With regard to SJW and PCDC's argument that the Palmer companies' counterclaims were really third-party actions, SJW and PCDC do not cite to any authority supporting their contention. In fact, we are only able to find one case addressing such a contention within the context of section 16.069. *See J.M.K. 6, Inc. v. Gregg & Gregg, P.C.*, 192 S.W.3d 189, 199-202 (Tex. App.–Houston [14th Dist.] 2006, no pet.). In *J.M.K. 6*, the Fourteenth Court of Appeals concluded that third-party actions are not contemplated by the terms "counterclaim or cross claim" contained in section 16.069 of the civil practice and remedies code and that "the purpose of section 16.069 would not be served by rewriting it to allow a defendant to revive an expired claim against a non-party." *Id.* at 200-02; *see* TEX. CIV. PRAC. & REM. CODE ANN. § 16.069. Thus, if the Palmer companies' counterclaims are really third-party actions, then their tortious interference with contract and prospective business relations claims would not be saved by section 16.069.

In reviewing rules 38 and 97 of the rules of civil procedure, we conclude that the Palmer companies' claims against SJW are not third-party actions but, rather, constitute counterclaims. *See* TEX. R. CIV. P. 38, 97. Rule 38, entitled "Third-Party Practice," states that:

> At any time after commencement of the action a defending party, as a third-party plaintiff, may cause a citation and petition to be served upon a person not a party to the action who is or may be liable to him or to the plaintiff for all or part of the plaintiff's claim against him.

31

*Id.* at R. 38. On the other hand, rule 97(b) provides that: "A pleading may state as a counterclaim any claim against an opposing party whether or not arising out of the transaction or occurrence that is the subject matter of the opposing party's claim." *Id.* at R. 97(b).

In the instant case, SJW filed suit against the Palmer companies, including SPP and Palmer, individually. The Palmer companies' February 9, 2004 counterclaims did not assert causes of action against "a person not a party to the action who is or may be liable to him or to the plaintiff for all or part of the plaintiff's claim against him." *See id.* at R. 37. Instead, the Palmer companies' February 9, 2004 counterclaims state claims that, as we have already concluded, arise out of the same transaction or occurrence as SJW's dispute involving commissions at the Jackson Palmer Crossing shopping center and were against the opposing party—SJW. *See id.* at R. 97(b); *CDB Software, Inc. v. Kroll*, 982 S.W.2d 629, 632 (Tex. App.–Houston [1st Dist.] 1998, no pet.); *Latham v. Allison*, 560 S.W.2d 481, 485 (Tex. App.–Fort Worth 1977, writ ref'd n.r.e.) (defining a counterclaim as "a claim, which, if established will defeat or in some way qualify a judgment to which the plaintiff is otherwise entitled. It embraces both setoff and recoupment, and also comprehends reconvention as well as all adversary actions by the defendant in a case"); *see also* BLACK'S LAW DICTIONARY 286 (7th ed. 2000) (defining a counterclaim as "[a] claim for relief asserted against an opposing party after an original claim has been made"). We therefore conclude that the Palmer companies' claims against SJW constituted counterclaims and, thus, fell within the scope of section 16.069 of the civil practice and remedies code. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.069; *see also* TEX. R. CIV. P. 97(b).

### 4. The Palmer Companies' Claims Against PCDC

Regarding PCDC's inclusion in this dispute, SJW and PCDC argue that because

PCDC was not added to the lawsuit until June 23, 2006, the Palmer companies' claims against PCDC are barred by limitations. SJW and PCDC further argue that the Palmer companies' claims against PCDC constitute a third-party action rather than a counterclaim; thus, the tolling of the limitations period under sections 16.068 and 16.069 is not allowed for the third-party action. The Palmer companies contend that: (1) PCDC had fair notice of the Palmer companies' claims, and, thus, PCDC could not have been prejudiced by its inclusion in the lawsuit; and (2) the evidence suggests that SJW and PCDC "are closely related, if not identical" and that the claims alleged against PCDC arose out of the same transaction or occurrence as the Palmer companies' claims against SJW.[18]

PCDC was not a party to SJW's original petition and was joined to the lawsuit when the Palmer companies filed their second amended answer and counterclaims on June 23, 2006, approximately six years after the causes of action contained in the Palmer companies' counterclaims accrued. Because PCDC was joined as a party to the action by the Palmer companies on June 23, 2006, Texas Rule of Civil Procedure 38 dictates a finding that the Palmer companies' claims against PCDC constituted a third-party action. *See* TEX. R. CIV. P. 38. Therefore, because the Palmer companies claims against PCDC were actually third-party actions rather than counterclaims or cross claims, we conclude that the claims against PCDC were not tolled by either section 16.068 or section 16.069 of the civil practice and remedies code and were, thus, time-barred. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 16.068, 16.069; *see also J.M.K. 6, Inc.*, 192 S.W.3d at 199-202.

In sum, we hold that: (1) the Jackson Palmer Crossing dispute and the Trenton Project dispute are inextricably intertwined and, thus, constitute a single transaction or

---

[18] The Palmer companies do not cite, nor are we aware of, authority supporting the application of the relation-back doctrine to time-barred claims against a third-party that may be "closely related, if not identical" to a properly named party to a lawsuit.

33

occurrence; (2) SPP had standing to file its February 9, 2004 counterclaims against SJW; (3) Palmer was properly substituted as "Counter-Plaintiff" in the Palmer companies' first amended answer and counterclaims; (4) the Palmer companies' claims against SJW constituted counterclaims; (5) the Palmer companies' counterclaims against SJW were tolled by sections 16.068 and 16.069 of the civil practice and remedies code and, therefore, relate back to the Palmer companies' timely-filed February 9, 2004 counterclaims; and (6) the Palmer companies' claims against PCDC constituted third-party actions, which did not toll the applicable limitations periods. Accordingly, we overrule SJW and PCDC's first issue, in part, and sustain it, in part.

## IV. LEGAL AND FACTUAL SUFFICIENCY OF THE JURY'S LIABILITY FINDINGS

By their second issue, SJW and PCDC argue that the evidence supporting the jury's verdict that SJW and PCDC: (1) intentionally interfered with Palmer's earnest money contracts; (2) breached a fiduciary duty allegedly owed to Palmer; and (3) committed fraud on Palmer is insufficient. The Palmer companies assert that the evidence supporting the jury's liability findings is supported by legally and factually sufficient evidence.

### A. Standard of Review

At the outset of our analysis on this issue, we note that because the Palmer companies' claims against PCDC were barred by limitations, we need not address SJW and PCDC's contentions regarding the sufficiency of the evidence supporting the jury's verdict as to PCDC.[19] *See* TEX. R. APP. P. 47.1.

We must sustain a challenge to a jury finding based on legal sufficiency only when: (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is

---

[19] Because we have concluded that the Palmer companies' claims against PCDC were time-barred, we only reference SJW as appellant/cross-appellee for the remaining issues in this case.

34

barred by rule of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence provided to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810-11 (Tex. 2005). "[W]hen the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is less than a scintilla and, in legal effect, is no evidence." *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004). More than a scintilla of evidence exists if the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Id.*

In our legal sufficiency review, we review the evidence in the light most favorable to the finding, crediting favorable evidence if a reasonable fact-finder could and disregarding contrary evidence unless a reasonable fact-finder could not. *City of Keller*, 168 S.W.3d at 807. The final test for legal sufficiency is whether the evidence presented at trial would enable reasonable and fair-minded people to make the finding under review. *Id.* at 827.

The jury is the sole judge of witnesses' credibility, and it may choose to believe one witness over another; a reviewing court may not impose its own opinion to the contrary. *Id.* at 819. Because it is the jury's province to resolve conflicting evidence, we must assume that jurors resolved all conflicts in accordance with their verdict if reasonable human beings could do so. *Id.*

On the other hand, when reviewing a jury finding for factual sufficiency, we consider all of the evidence in a neutral light and conclude that the finding is not supported by sufficient evidence only if the finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.

35

1986) (per curiam). If we determine that the evidence supporting the jury's verdict is not supported by factually sufficient evidence, we must "detail the evidence relevant to the issue" and "state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict." *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (per curiam).

## B. Tortious Interference With Contract

The elements of tortious interference with a contract are: (1) the existence of a contract subject to interference; (2) willful and intentional interference; (3) interference that proximately caused damage; and (4) actual damage or loss. *ACS Invs., Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997).

On appeal, SJW contends that the jury's verdict regarding the Palmer companies' tortious interference with a contract and prospective business relations is not supported by legally and factually sufficient evidence. Specifically, SJW contends that Palmer failed to prove the essential elements of his intentional interference with contract claims because: (1) the record does not show that Palmer had contracts with Whisenant, Wayne and Gelee Allen, and Kayser in April 2000; (2) Palmer's earnest money contracts were "never closed" because he allegedly failed to deposit earnest money with the title company; and (3) Palmer's own greed, rather than the alleged conduct of SJW, was the cause of the delay in selling the property to Target for a profit.

### 1. Palmer's Earnest Money Contracts

Palmer testified that he had all of the landowners at the Trenton Project, except for Dr. Kilgore, under contract in April 2000. The group included Whisenant and Wayne and Gelee Allen. Moreover, the record contains copies of the contracts between Palmer and all of the landowners, except Wayne and Gelee Allen. Wayne Allen testified via deposition

36

that he and his wife, Gelee, were under contract with Palmer in April 2000. Furthermore, Schwarz specifically recalled Palmer having five contracts—with Whisenant, Wayne and Gelee Allen, Opal Baldwin, Harlon and Mary Robinson, and Yvonne Robinson—at the Trenton Project in April 2000.

The disputed Whisenant contract is also contained in the record and demonstrates that Palmer contracted to pay Whisenant $467,712.50 or, in other words, $10.00 per square foot for his 22.36-acre tract. The Whisenant contract, however, does not specify an effective date. The Kayser tract, on the other hand, does not appear to be under contract in April 2000. However, Palmer testified that he and Kayser began negotiations in the middle of 2000, and eventually agreed to a contract, whereby Palmer purchased Kayser's tract for $3.5 million.

We first note that the jury charge does not contain a question asking the jury to specifically determine whether Palmer had all of the landowners, including Kayser, under contract in April 2000. The jury was merely asked whether SJW interfered with any of Palmer's earnest money contracts. SJW did not object to the jury charge questions pertaining to the Palmer companies' tortious interference claims. *See In re B.L.D.*, 113 S.W.3d 340, 349 (Tex. 2003) ("[A]ny complaint to a jury charge is waived unless specifically included in an objection.") (citing TEX. R. CIV. P. 274; TEX. R. APP. P. 33.1(a)(1)); *see also Statewide Mobile Homes, L.L.C. v. Tesoro, Inc.*, No. 13-08-00313-CV, 2009 Tex. App. LEXIS 6332, at *8 (Tex. App.–Corpus Christi Aug. 13, 2009, no pet.) (mem. op.). Therefore, to the extent that SJW complains about the jury's verdict relating to the dates in which Palmer had each of the landowners under contract, we conclude that such complaints were waived by failure to lodge a specific objection to the jury charge or request that such a question be included in the jury charge.

37

SJW also contends that even if Palmer had the above-mentioned parties under contract, the earnest money contracts were unenforceable and could not be the basis for the Palmer companies' tortious interference with contract claims because the earnest money checks were not directly deposited with the title company. With regard to a similar dispute, the supreme court has stated the following:

> [E]ven an unenforceable contract may serve as the basis for a tortious interference claim if the contract is not void. . . . In other words, mere unenforceability of a contract is not a defense to an action for tortious interference with its performance. . . . Until a contract is terminated, it is valid and subsisting, and third persons are not free to tortiously interfere with it.

*Juliet Fowler Homes, Inc. v. Welch Assocs.*, 793 S.W.2d 660, 664, 666 (Tex. 1990).

Here, Palmer testified that he tendered earnest money checks for each of the contracts to Schwartz. Schwartz recalled receiving all of the earnest money checks from Palmer, but the contracts themselves do not state that the earnest money checks were deposited with the title company. Instead of depositing the earnest money with the title company, Schwartz apparently kept the earnest money in his files, and he could not recall why this was done. In any event, the landowners and Palmer all thought that they had valid and enforceable contracts, as evidenced by the landowners granting Palmer several extensions of time to determine the feasibility of the project. Moreover, the contracts do not contain a provision stating that a failure to deposit earnest money with the title company renders the contract null and void. Instead, the contracts were voidable, meaning the landowners had the option to terminate the contract—which only Opal Baldwin and Harlon and Mary Robinson did a couple days after being approached by SJW—or the landowners could ratify non-compliance with the contract. *See Swain v. Wiley College*, 74 S.W.3d 143, 146 (Tex. App.–Texarkana 2002, no pet.) (stating that a voidable contract can be ratified). Clearly, the parties believed that they had valid and enforceable contracts.

38

Furthermore, the record does not demonstrate that the earnest money was ever deposited with the title company; however, Target accepted Palmer's assignment of the allegedly unenforceable contracts and proceeded to develop the property.

Given the facts in this case and the supreme court's holding in *Juliet Fowler Homes*, we cannot say that Palmer's alleged failure to deposit the earnest money checks with the title company is of any importance to our analysis of the Palmer companies' tortious interference with contract claims, especially considering that the supreme court specifically held that it is possible for a third party to tortiously interfere with an unenforceable contract so long as the contract is not void. Palmer's earnest contracts were not a nullity at their inception or, in other words, void. *See id.*; *see also Hacienda Ford v. Smart Auto. Group, L.L.C.*, No. 13-04-00605-CV, 2006 Tex. App. LEXIS 6658, at *8 (Tex. App.–Corpus Christi July 27, 2006, pet. denied) (mem. op.) ("It is well settled that a contract is void when it is for 'a thing which cannot be performed without a violation of the law . . . .'") (quoting *Lewis v. Davis*, 145 Tex. 468, 199 S.W.2d 146, 148-49 (1947)); *Swain*, 74 S.W.3d at 146 (stating that a void contract cannot be ratified and is, therefore, a nullity at its inception).

Based on the foregoing, we conclude that there was sufficient evidence for the jury to conclude that Palmer had Whisenant, Wayne and Gelee Allen, Yvonne Robinson, Opal Baldwin, Harlon and Mary Robinson, and Eugene Kayser under contract.

### 2. The Remaining Elements of the Palmer Companies' Tortious Interference With a Contract Causes of Action

With regard to the "willful and intentional interference" prong of the tortious interference with contract cause of action, Texas courts have held that interference with a contract is tortious only when it is intentional, and there must be some direct evidence of a willful act of interference by a party. *See Browning-Ferris, Inc. v. Reyna*, 865 S.W.2d

925, 927 (Tex. 1993); *see also Sw. Bell Tel. Co. v. John Carlo Tex., Inc.*, 843 S.W.2d 470, 471 (Tex. 1992). A party must be more than a willing participant; he must knowingly induce one of the contracting parties to breach its obligations. *See Reyna*, 865 S.W.2d at 927; *John Paul Mitchell Sys. v. Randalls Food Mkts.*, 17 S.W.3d 721, 731 (Tex. App.–Austin 2000, pet. dism'd w.o.j.)[20]; *see also Arabesque Studios, Inc. v. Academy of Fine Arts Int'l Inc.*, 529 S.W.2d 564, 568 (Tex. Civ. App.–Dallas 1975, no writ) (holding that a plaintiff must show that defendant caused the interference, and it is not enough that defendant reaped an advantage of a contract broken by the breaching party's own volition).

Here, the record demonstrates that Palmer had earnest money contracts with Whisenant, Wayne and Gelee Allen, Yvonne Robinson, Opal Baldwin, and Harlon and Mary Robinson through September 2000. However, in September 2000, when Palmer's earnest money contracts were expiring, Trozzo, on behalf of SJW, approached the landowners to allegedly inquire whether they were still under contract. Trozzo's efforts were documented in a September 7, 2000 letter, where he thanked the landowners for their time and noted that SJW was not aware that the landowners were still under contract. This letter, however, appears to be disingenuous considering the testimony of Palmer and Dr. Kilgore.

Palmer testified that SJW was always aware of the status of Palmer's earnest money contracts and that, in September 2000, he still had all of the landowners except for

---

[20] In *John Paul Mitchell Systems v. Randalls Food Markets*, the Austin Court of Appeals stated that:

> A necessary element of the plaintiff's cause of action is a showing that the defendant took an active part in persuading a party to a contract to breach it. Merely entering into a contract with a party with the knowledge of that party's contractual obligations to someone else is not the same as inducing a breach. It is necessary that there be some act of interference or of persuading a party to breach, for example by offering better terms or other incentives, for tort liability to arise.

17 S.W.3d 721, 731 (Tex. App.–Austin 2000, pet. dism'd w.o.j.) (quoting *Davis v. HydPro, Inc.*, 839 S.W.2d 137, 139 (Tex. App.–Eastland 1992, writ denied) (internal quotations omitted)).

Dr. Kilgore under contract. Palmer alleged that Trozzo's efforts were an attempt to induce the landowners to terminate their contracts with Palmer and enter into similar contracts with SJW. Dr. Kilgore corroborated Palmer's testimony by stating that he was approached by Trozzo during the early stages of the development of the Trenton Project, and that Trozzo informed Dr. Kilgore that SJW intended to get Dr. Kilgore under contract to tie up the development until Palmer's earnest money contracts expired so that SJW could then get the landowners under contract and sell the property to Target themselves.[21]

As a result of Trozzo's interactions with the landowners, Opal Baldwin and Harlon and Mary Robinson, all elderly landowners, each sent Palmer nearly identically-worded letters a couple days later, notifying him that their earnest money contracts were "*terminated*" and "*null and void*." (Emphasis in original.) Furthermore, the remaining landowners became anxious and demanded assurances from Palmer that he could get Dr. Kilgore under contract soon so that the land could be packaged and sold to Target. In a letter to SJW dated September 13, 2000, Palmer informed SJW that he was aware of SJW's efforts to induce the landowners to breach their contracts and that SJW's actions "tarnished [Palmer's] reputation as a developer in the community" and "resulted in substantial loss to [Palmer]."

Palmer's damages expert, Bill Abington, a certified public accountant and a certified fraud examiner, evaluated the economic losses sustained by the Palmer companies as a result of SJW's alleged wrongful conduct. Abington concluded that the Palmer companies

---

[21] As noted earlier, Dr. Kilgore's tract was an essential piece of the land package to be presented to Target. Target was not interested in only purchasing non-contiguous parcels of land. Furthermore, it was not until much later in the life of the Trenton Project that Palmer learned that SJW had Dr. Kilgore under contract since June 6, 2000. SJW, acting as Target's agent, willingly assigned its interest in Dr. Kilgore's tract after Palmer agreed to assign the tracts he had under contract; thus, Target was assigned a complete parcel of land to develop. Therefore, SJW's argument that the Palmer companies' failure to secure a profit from Target was due to Palmer's own greed appears to be unfounded.

sustained $376,397 in damages regarding the delayed sale of the Robinson tract to Target, $207,926 associated with lost rental income, and various other damages.

With regard to Palmer's contract with Kayser, Palmer testified that when he met with Stanley Williams in May 2001, Palmer was already in negotiations with Kayser for the purchase of his land. Palmer alleged that Kayser had approved a contract for the sale of his land to Palmer for $1.96 million. However, the record does not include a copy of this purported contract. In any event, Palmer met with Stanley Williams on the premise that Jay Williams and Trozzo would not be involved in further deals between Palmer and SJW. Prior to the meeting, Stanley Williams requested additional confidential pricing and contractual information from Palmer. At the conclusion of the meeting, Palmer agreed to assign his earnest money contracts at the Trenton Project to Target for no profit in exchange for the REA, which would assist Palmer in developing the Kayser tract. It is unlikely that Palmer would not have bargained for the REA if he did not have the Kayser tract under contract or he was confident that he could quickly acquire the Kayser tract for development.

Palmer then testified that Trozzo called Kayser and offered him $3 million for the land even though Palmer had already allegedly had an approval from Kayser for the purchase of the land for $1.96 million.[22] Palmer believed that Stanley Williams informed Trozzo of the importance of the REA, and Trozzo subsequently bid up the price of the Kayser tract and attempted to induce Kayser to breach his land-sale agreement with Palmer. As a result of SJW's efforts, Palmer alleged that he was forced to buy the Kayser tract in 2002, for $3.5 million, which was significantly higher than the purported original

---

[22] The record includes a purchase agreement sent by SJW to Kayser, offering Kayser $2,213,719.20 for his land. This agreement, however, was neither signed nor executed.

$1.96 million agreement.

SJW directs us to several exhibits in the record which allegedly undermine Palmer's allegations; however, we must keep in mind that the resolution of conflicting evidence and testimony was within the province of the jury, and we must not substitute our judgment for that of the jury. *See City of Keller*, 168 S.W.3d at 819. Clearly, the jury believed Palmer's version of what had happened, and we must defer to the jury's conclusions so long as the conclusions are reasonable. *See id.* In reviewing the evidence in the light most favorable to the jury's findings, we conclude that the jury was reasonable in concluding that SJW willfully and intentionally interfered with Palmer's contracts and that SJW's interference proximately caused Palmer actual damages or loss. *See id.* at 807, 810-11; *see also McLaughlin*, 943 S.W.2d at 430. Furthermore, in reviewing the evidence in a neutral light, we cannot conclude that the jury's findings as to this issue were so contrary to the overwhelming weight of the evidence as to be clearly wrong or unjust. *See Cain*, 709 S.W.2d at 176. Accordingly, we find that the evidence supporting the jury's conclusion that SJW tortiously interfered with Palmer's contracts is legally and factually sufficient. *See City of Keller*, 168 S.W.3d at 807, 810-11; *see also Cain*, 709 S.W.2d at 176.

## C.     Breach of Fiduciary Duty

While we note that section 41.002(a) of the civil practice and remedies code—contained within the exemplary damages chapter—"applies to any action in which a claimant seeks damages relating to a cause of action" and, therefore, the jury's exemplary damage award may be sustained solely by Palmer's tortious-interference claims, we analyze Palmer's breach of fiduciary duty and fraud causes of action because our attorney's fees analysis is partially premised on the jury's findings on these causes of action. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.002(a) (Vernon 2008).

43

In order to prevail on a breach of fiduciary duty claim, a plaintiff must prove: (1) the existence of a fiduciary relationship between the plaintiff and the defendant; (2) a breach by the defendant of his or her fiduciary duty to the plaintiff; and (3) an injury to the plaintiff or benefit to the defendant as a result of the breach. *See Lundy v. Masson*, 260 S.W.3d 482, 501 (Tex. App.–Houston [14th Dist.] 2008, pet. denied); *see also Bradshaw v. Bonilla*, No. 13-08-00595-CV, 2010 Tex. App. LEXIS 662, at *9 (Tex. App.–Corpus Christi Jan. 28, 2010, pet. denied) (mem. op.). A plaintiff bears the burden of proving each element of his breach of fiduciary duty claim. *See, e.g., Avary v. Bank of Am., N.A.*, 72 S.W.3d 779, 792 (Tex. App.–Dallas 2002, pet. denied).

A fiduciary relationship may arise as a matter of law in certain formal relationships. *See Meyer v. Cathey*, 167 S.W.3d 327, 330 (Tex. 2005) (per curiam); *Priddy v, Rawson*, 282 S.W.3d 588, 600 (Tex. App.–Houston [14 th Dist.] 2009, pet. denied); *see also Lundy*, 260 S.W.3d at 501; *Cotten v. Weatherford Bancshares, Inc.*, 187 S.W.3d 687, 698 (Tex. App.–Fort Worth 2006, pet. denied). However, because not every relationship involving a high degree of trust and confidence rises to the stature of a formal fiduciary relationship, the law also recognizes the existence of an informal or confidential fiduciary relationship. *Meyer*, 167 S.W.3d at 330. An informal fiduciary relationship may arise from a moral, social, domestic, or purely personal relationship of trust and confidence. *Id.*; *see Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 594 (Tex. 1992); *Priddy*, 282 S.W.3d at 600; *Cotten*, 187 S.W.3d at 698. The moral, social, domestic, or personal relationship upon which the informal or confidential relationship is predicated "'must exist prior to, and apart from the agreement made the basis of the suit.'" *Meyer*, 167 S.W.3d at 331 (quoting *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 177 (Tex. 1997)); *Priddy*, 282 S.W.3d at 600; *see Hubbard v. Shankle*, 138 S.W.3d 474, 483 (Tex.

44

App.–Fort Worth 2004, pet. denied) ("In other words, there must be a preexisting special relationship of trust and confidence that is betrayed in later dealings."). A person is justified in placing confidence in the belief that another party will act in his best interest only where he is accustomed to being guided by the judgment or advice of the other party and there exists a long association in a business relationship as well as a personal friendship. *Hoggett v. Brown*, 971 S.W.2d 472, 488 (Tex. App.–Houston [14th Dist.] 1997, pet. denied); *see Ins. Co. of Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998) (providing that "confidential relationships may arise when the parties have dealt with each other in such a manner for a long period of time that one party is justified in expecting the other to act in its best interest"). Moreover, mere subjective trust is insufficient to establish a confidential relationship that gives rise to a fiduciary duty. *Meyer*, 167 S.W.3d at 331.

SJW argues on appeal that the evidence suggests that it was Palmer's broker or, in other words, Palmer's agent at the Jackson Palmer Crossing development but not at the Trenton Project. Instead, SJW contends that the evidence only supports a finding that SJW was Palmer's competitor at the Trenton Project site.

The relationship between agent and principal is a fiduciary relationship. RESTATEMENT (SECOND) OF AGENCY § 1 (1958). An agency relationship does not depend upon the express appointment or assent by the principal; rather, it may be implied from the conduct of the parties. *Orozco v. Sander*, 824 S.W.2d 555, 556 (Tex. 1992); *see Ross v. Tex. One P'ship*, 796 S.W.2d 206, 210 (Tex. App.–Dallas 1990), *writ denied per curium*, 806 S.W.2d 222 (Tex. 1991); *Mercedes-Benz of N. Am., Inc. v. Dickenson*, 720 S.W.2d 844, 858 (Tex. App.–Fort Worth 1986, no writ). An agent is one who is authorized by another to transact business or manage some affair for him. *Welch v. Coca-Cola Enters., Inc.*, 36 S.W.3d 532, 539 (Tex. App.–Tyler 2000, pet. withdrawn). The existence of an

45

agency relationship may be established by circumstantial evidence based upon proof of all the facts and circumstances that shows the relationship of the parties and throws light upon the character of such relations. *Id.* at 540.

In finding that SJW breached a fiduciary duty to Palmer, the jury implicitly concluded that Palmer was the principal and that SJW was his agent. SJW is correct in stating that the record does not contain a contract expressly providing that SJW owed a fiduciary duty to Palmer; however, as noted above, such a duty can be inferred from the conduct of the parties. *See Orozco*, 824 S.W.2d at 556; *Welch*, 36 S.W.3d at 540; *see also Ross*, 796 S.W.2d at 210; *Dickenson*, 720 S.W.2d at 858.

Here, Palmer testified that he asked Stanley and Jay Williams, who were acting on behalf of SJW, to be his broker at the Trenton Project and that Stanley and Jay agreed to do so, as they had done at the Jackson Palmer Crossing development. The record reflects that Palmer met with Stanley and Jay Williams on numerous occasions, including in Las Vegas, to discuss confidential pricing and contractual information regarding the project and that Palmer shared the information about the project so that SJW could get Dr. Kilgore under contract and market the properties for development by Target. Palmer also met with Jay Williams and Trozzo at a hunting lease in Encino, Texas, in order to discuss progress on the Trenton Project, which included a discussion about Albertson's being the anchor tenant for the development in the event that Target could not be persuaded to participate in the project.

Schwartz testified that he understood SJW to be Palmer's broker for the Trenton Project and that Palmer agreed to provide SJW a 6% commission for brokerage services. Mark Freeland, a McAllen attorney that is board certified in residential, commercial, and farm and ranch real estate law, noted that SJW first started acting as a broker for Palmer

46

at the Jackson Palmer Crossing in 1998, and that SJW began serving as Palmer's broker for the Trenton Project "around 2000." Freeland also noted that he had "no doubt" that SJW owed a fiduciary duty to Palmer regarding the Trenton Project and that Palmer's conveying of confidential pricing and contractual information and his request that SJW get Dr. Kilgore under contract evidences the existence of the fiduciary duty. Another expert, Charles Ray Porter Jr., a commercial real estate broker, testified that, based on his review of the documents and testimony in this case, he believed that SJW owed a fiduciary duty to Palmer, and if SJW did not intend to be Palmer's broker at the Trenton Project, it should have expressly disclaimed that such a duty existed at the Trenton Project, especially considering the prior relationships of the parties at the Jackson Palmer Crossing development.

SJW directs us to letters dated March 17, 2000 and March 21, 2000, in which Palmer offered to sell the properties to SJW for $4.9 million, and SJW countered by offering Palmer $2.6 million for the properties. SJW argues that these letters indicate that the parties were competitors. This evidence appears to contradict the testimony provided by Palmer, Schwartz, Freeland, and Porter. However, the reconciliation of such conflicting evidence was within the province of the jury, and we must defer to the jury's resolution so long as the jury's finding is reasonable. *See City of Keller*, 168 S.W.3d at 819. In concluding that SJW breached a fiduciary duty owed to Palmer at the Trenton Project, the jury clearly rejected SJW's assertion that the March 17, 2000 and March 21, 2000 letters evidenced that the parties were competitors.

Based on the foregoing, we conclude that the jury was reasonable in inferring that a fiduciary relationship existed between SJW and Palmer. *See Orozco*, 824 S.W.2d at 556; *Welch*, 36 S.W.3d at 540; *see also Ross*, 796 S.W.2d at 210; *Dickenson*, 720 S.W.2d

47

at 858. Given that, we must now analyze the remaining elements of Palmer's breach-of-fiduciary-duty claim.

With respect to the breach and injury prongs of Palmer's breach-of-fiduciary-duty cause of action, several witnesses testified that SJW obtained confidential information from Palmer regarding the Trenton Project and then used that information to get Dr. Kilgore under contract in order to tie up the development of the project. In addition, the record reflects that SJW approached and encouraged the landowners that Palmer had under contract to breach their contracts with Palmer so that SJW could package the land together itself for sale to Target. SJW also hid from Palmer the fact that it had Dr. Kilgore's tract of land, a crucial parcel of land to the development, under contract and that it was waiting until Palmer's contracts with the landowners expired to develop the land itself. As a result of SJW's actions, witnesses testified that Palmer suffered $709,587 in actual damages and was forced to assign the properties to Target in exchange for the REA. However, once Palmer received the REA, Trozzo, on behalf of SJW, bid up the price of the adjoining Kayser tract to render the REA worthless or to force Palmer to incur additional development expenses.

Viewing the evidence in the light most favorable to the jury's verdict, we conclude that the jury was reasonable in concluding that SJW owed Palmer a fiduciary duty and that SJW breached that duty and caused injury to Palmer. *See City of Keller*, 168 S.W.3d at 807, 827. Thus, we hold that the evidence supporting the jury's verdict as to Palmer's breach of fiduciary duty claim is legally sufficient. *See id.* On the other hand, viewing the evidence in a neutral light, we cannot say that the jury's verdict pertaining to Palmer's breach of fiduciary duty claim is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust; therefore, we hold that the evidence supporting the jury's

verdict as to Palmer's breach of fiduciary duty claim is factually sufficient. *See Cain*, 709 S.W.2d at 176.

## D.    Fraud

The elements of a cause of action for fraud are:  (1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party suffered injury as a result.  *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001); *Bradford v. Vento*, 48 S.W.3d 749, 754-55 (Tex. 2001).  A promise to do an act in the future constitutes fraud only when made with no intention of performing the promise at the time the promise was made.  *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex.1998).  The mere failure to perform a contract is not evidence of fraud.  *Id.*  Fraudulent intent may be established by either direct or circumstantial evidence, and the subsequent failure to perform the promise, while not alone dispositive, can be considered with other factors to establish intent. *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434-35 (Tex. 1986).

Here, the jury concluded that SJW committed fraud against Palmer and that Palmer, through exercise of due diligence, should have discovered the fraud by September 8, 2000. Palmer testified that he regularly met with SJW representatives to discuss confidential pricing and contractual information regarding the Trenton Project and that he notified SJW that he was unable to get Dr. Kilgore under contract.  Palmer noted that SJW continued to represent to him that they were working with Target to complete the development and that they would work on getting Dr. Kilgore's tract under contract in exchange for the

49

regular updates regarding pricing and contractual information pertaining to the project. Palmer believed, and the jury agreed, that SJW was working as his broker on this project. However, unknown to Palmer during his meetings with SJW representatives, SJW already had Dr. Kilgore under contract, and, as noted by the landowners and Dr. Kilgore, SJW intended to either wait until Palmer's contracts with the landowners expired or induce the landowners to breach their contracts with Palmer in order for SJW to develop the project themselves. Later, Palmer discovered that Trozzo and Jay Williams had deceived him by representing that they were working on getting Dr. Kilgore's tract under contract for Palmer's benefit when, in fact, as Trozzo testified, SJW sought out Dr. Kilgore and got him under contract for SJW's benefit.

Palmer further testified that once he discovered the deceit of Trozzo and Jay Williams, Stanley Williams contacted Palmer to resume the business relationship and assured him and the landowners that Trozzo and Jay Williams would not have any further involvement in the project. After receiving adequate assurances from Stanley Williams, Palmer agreed to assign to Target the landowners' property that he had under contract in exchange for the REA, which was conditioned on Palmer's purchase of the Kayser tract within twelve months. Palmer later discovered that, despite Stanley's assurances, Trozzo remained involved in the project and subsequently bid up the price of the Kayser tract in an attempt to render the REA worthless.

Based on our review of the record, we hold there is ample evidence for a reasonable juror to conclude that SJW committed fraud upon Palmer. *See Ernst & Young, L.L.P.*, 51 S.W.3d at 577; *Bradford*, 48 S.W.3d at 754-55; *see also Spoljaric*, 708 S.W.2d at 434-35. The record indicates that SJW representatives repeatedly informed Palmer that they were acting on Palmer's behalf in getting Dr. Kilgore's tract under contract and in assembling the

50

properties for sale to Target. Moreover, Stanley Williams, as president of SJW, represented to Palmer that Trozzo and Jay Williams would not be involved in the project after Palmer discovered the deception involving Dr. Kilgore's tract of land. Both of these representations were material to the transactions at issue. *See Ernst & Young, L.L.P.*, 51 S.W.3d at 577; *Bradford*, 48 S.W.3d at 754-55. However, neither of these representations were true, and a reasonable juror could infer that, at the time the representations were made, SJW representatives were aware that the statements were false or that they made them recklessly without knowledge of their veracity. *See Ernst & Young, L.L.P.*, 51 S.W.3d at 577; *Bradford*, 48 S.W.3d at 754-55. In addition, a reasonable juror could infer that the representations were made to induce Palmer to: (1) disclose to SJW confidential pricing and contractual information; and (2) assign the landowners' properties to Target in exchange for the REA, which Trozzo attempted to render worthless by bidding up the price of the Kayser tract. *See Ernst & Young, L.L.P.*, 51 S.W.3d at 577; *Bradford*, 48 S.W.3d at 754-55; *see also Spoljaric*, 708 S.W.2d at 434-35. Finally, Palmer clearly relied upon the representations made by SJW to further the development of the Trenton Project and, according to his damages experts, sustained $709,587 in actual damages. *See Ernst & Young, L.L.P.*, 51 S.W.3d at 577; *Bradford*, 48 S.W.3d at 754-55.

Therefore, viewing the evidence in the light most favorable to the jury's verdict, we conclude that the jury was reasonable in concluding that SJW committed fraud upon Palmer. *See City of Keller*, 168 S.W.3d at 807, 827. Thus, we hold that the evidence supporting the jury's verdict as to Palmer's fraud claim is legally sufficient. *See id.* On the other hand, viewing the evidence in a neutral light, we cannot say that the jury's verdict pertaining to Palmer's fraud claim is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust; therefore, we hold that the evidence supporting

51

the jury's verdict as to Palmer's fraud claim is factually sufficient.  *See Cain*, 709 S.W.2d at 176.  Accordingly, we overrule SJW's second issue.[23]

## V.  THE DAMAGE AWARD

By its third issue, SJW argues that the jury's damage awards are not supported by legally and factually sufficient evidence.  In particular, SJW challenges:  (1) the damage calculations made by Palmer's expert, Abington, as speculative; and (2) the jury's finding that SJW acted with malice in allegedly intentionally interfering with Palmer's earnest money contracts.  The Palmer companies contend that the jury's damage awards are supported by legally and factually sufficient evidence.  The Palmer companies highlight the fact that SJW did not object to Abington's damages model and testimony at trial.  Furthermore, the Palmer companies argue that the punitive damages cap does not apply, and the jury was not required to find that a vice-principal of SJW intentionally interfered with Palmer's earnest money contracts in order to sustain the punitive damage awards.

### A.    The Jury's Award of Actual Damages to the Palmer Companies

#### 1.    Standard of Review and Applicable Law

On appeal, SJW challenges the legal and factual sufficiency of the jury's actual damages award.  We review the jury's actual damages award under the same well-established legal and factual sufficiency standards outlined in Part IV(A) of this opinion.  We do note, however, that actual damages are a prerequisite to an exemplary damage award.  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.004(a) (Vernon 2008); *see also Wright v. Gifford-Hill & Co.*, 725 S.W.2d 712, 713-14 (Tex. 1987); *Swinnea v. ERI Consulting*

---

[23] We need not address the Palmer companies' tortious interference with prospective business relations claims because we have already concluded that the evidence supporting the Palmer companies' tortious interference with a contract claim was supported by legally and factually sufficient evidence and the jury charge did not segregate the two claims.  *See* TEX. R. APP. P. 47.1.  The jury was merely questioned as to whether SJW intentionally interfered with Palmer's earnest money contracts.

*Eng'rs, Inc.*, 236 S.W.3d 825, 842 (Tex. App.–Tyler 2007, pet. granted). Therefore, if we were to find that the jury's actual damages award was not supported by legally and factually sufficient evidence, then we would not need to analyze the jury's exemplary damages award.

When a party properly objects to a jury question, we review the sufficiency of the evidence in the light of the charge that the trial court should have submitted. *W.L. Lindemann Operating Co. v. Strange*, 256 S.W.3d 766, 775 (Tex. App.–Fort Worth 2009, no pet.). Absent an objection to the jury charge, the sufficiency of the evidence is reviewed in light of the charge submitted. *Id.* (citing *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 715 (Tex. 2001); *City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 71 (Tex. 2000)). Here, SJW did not object to any questions contained in the jury charge that pertained to the calculation of damages; thus, we review the sufficiency of the damage awards in light of the charge submitted. *See id.*; *see also Sturges*, 52 S.W.3d at 715; *Zimlich*, 29 S.W.3d at 71.

### 2.    Discussion

On appeal, SJW argues that the evidence supporting the jury's actual damages awards is insufficient because Abington's calculations are speculative in nature and, therefore, amounted to no evidence.

In question number 22 of the charge, the jury was asked to determine the amount of money that would fairly and reasonably compensate Palmer for his damages, if any, that were proximately caused by SJW's conduct. The charge did not specifically attribute this damage question to any particular cause of action; therefore, it could have applied to the Palmer companies' fraud, breach of fiduciary duty, or tortious interference causes of

53

action.[24]  In any event, the jury concluded that Palmer sustained:  (1) $376,397 in damages for lost profits from the Robinson tract delay; (2) $207,926 in damages for lost profits from the rental revenue delay on the Kayser tract; and (3) $125,264 in damages for lost profits from the property sale delay also on the Kayser tract.  The jury's actual damages calculation is premised on evidence submitted by the Palmer companies as to lost profits.

"Lost profits are damages for the loss of net income to a business measured by reasonable certainty."  *Miga v. Jensen*, 96 S.W.3d 207, 213 (Tex. 2002); *see Bossier Chrysler Dodge II, Inc. v. Rauschenberg*, 201 S.W.3d 787, 808 (Tex. App.–Waco 2006), rev'd in part, 238 S.W.3d 376 (Tex. 2007) (per curiam).  "Net profits" are defined as "what remains in the conduct of a business after deducting from its total receipts all of the expenses incurred in carrying on the business."  *Turner v. PV Int'l Corp.*, 765 S.W.2d 455, 465 (Tex. App.–Dallas 1988, writ denied) (citing *R.A. Corbett Transp., Inc. v. Oden*, 678 S.W.2d 172, 176 (Tex. App.–Tyler 1984, no writ)).  "Thus, in order to recover lost profits, damages must be shown with 'reasonable certainty'[;] net profits must be shown by *objective*, rather than *subjective*, facts, figures, and data."  *Turner*, 765 S.W.2d at 465 (quoting *Automark of Tex. v. Discount Trophies*, 681 S.W.2d 828, 830 (Tex. App.–Dallas 1984, no writ)) (emphasis in original).  "Recovery for lost profits does not require that the loss be susceptible to exact calculation"; however "[a]t a minimum, opinions or lost-profit estimates must be based on objective facts, figures, or data from which the lost-profits amount may be ascertained."  *Helena Chem Co. v. Wilkins*, 47 S.W.3d 486, 504 (Tex. 2001) (citing *Szczepanik v. First S. Trust Co.*, 883 S.W.2d 648, 649 (Tex. 1994); *Tex.*

---

[24] SJW did not challenge, in the trial court, the charge's wording regarding the actual damages award and the fact that the question pertaining to actual damages is not attributed to a particular cause of action. *See Religious of the Sacred Heart of Tex. v. City of Houston*, 836 S.W.2d 606, 613-14 (Tex. 1992) (holding that any complaint as to the wording of the jury charge is waived if a proper objection is not made in the trial court).

*Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 279 (Tex. 1994); *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992)); *see Sw. Battery Corp. v. Owen*, 131 Tex. 423, 115 S.W.2d 1097, 1098-1099 (1938); *Orchid Software, Inc. v. Prentice-Hall, Inc.*, 804 S.W.2d 208, 211 (Tex. App.–Austin 1991, writ denied). The *Helena Chemical* court further noted that:

> We have held that past profits, coupled with other facts and circumstances, *may* establish a lost-profits amount with reasonable certainty. However, lack of a profit history does not, by itself, preclude a new business from recovering lost future profits. Rather, our focus is on whether damages can be shown with reasonable certainty. This can be accomplished with a profit history *or* some other objective data, such as future contracts, from which lost profits can be calculated with reasonable certainty.

47 S.W.3d at 505 (citations omitted) (emphasis in original).

The Palmer companies called Abington to testify on damages sustained as a result of SJW's wrongful conduct. Additionally, Abington provided numerous spreadsheets, which were admitted into evidence, to corroborate his testimony. After reviewing the evidence contained in the record, Abington concluded that the Palmer companies sustained $709,587 in actual damages. This calculation was comprised of three figures: (1) $376,397 in lost profits on the Robinson tract delay; (2) $207,926 in lost profits on delayed rental revenue; and (3) $125,264 in lost profits on the delayed sale of the properties.

In calculating damages associated with the Robinson tract delay, Abington relied on Palmer's earnest money contracts with Opal Baldwin, Wayne and Gelee Allen, Harlon and Mary Robinson, Yvonne Robinson, and Whisenant and assumed that all five of the contracts were effective on April 15, 2000, and were assigned to Target for no profit on June 15, 2001.[25] This accounted for a fourteen month delay. Abington then calculated a

---

[25] Abington testified that when he made his conclusions, he did not have contracts for two of the landowners that conclusively established effectiveness in April 2000, which appears to contradict the testimony of Palmer, Wayne Allen, and Schwarz that the contracts existed. Abington did note that he did have contracts for all five landowners that were effective in October 2000. For the two April 2000 contracts that

sales price for the land to be $2,950,101, which was based on representations made by Target as to the maximum price it would pay for the land—$4.50 per square foot for 15.05 acres.[26] Abington then subtracted the prices Palmer agreed to purchase the landowners' land for and closing costs, which appears to include the 6% commission fee included in each earnest money contract. The total costs amounted to $2,573,704, and the net profit amounted to $376,397.

With regard to his second calculation, Abington analyzed damages involving delayed rental income from the Kayser tract. Regarding the delays, Abington assumed a twelve-month delay, which was less than the actual nineteen-month delay to which Palmer testified—from the time Palmer and Kayser began negotiating, and Kayser's alleged approval of Palmer's $1.96 million offer around July 2000 to when the property was finally sold to Palmer in February 2002. Abington relied on a spreadsheet documenting actual rental payments made by businesses that were situated on the Kayser tract near the time of trial and determined that the assumed twelve-month delay on the account of SJW's wrongful actions Palmer lost $3,326,823 in rental income. Abington then used a conservative estimate of 6.25% for cost of capital and ultimately concluded that the Palmer companies sustained $207,926 in losses of rental income associated with the Kayser tract after subtracting "[a]ny expenses associated with really running the property."

Abington's final damages calculation addressed losses sustained by the Palmer companies as to the sale of portions of the Kayser tract to Bank of America, Jack-in-the-

---

were allegedly missing, Abington used the prices quoted in the corresponding October 2000 contracts and adjusted them by 3.85% to "roll them back to April 2000 prices," which was a low estimate for the price difference between April 2000 and October 2000, based on the average price differentials for Palmer's other earnest money contracts. Abington stressed that such calculations were necessary because, as a damages expert, he is charged with determining "[w]hat would have reasonably been expected to have occurred" and because that was what was contemplated to happen in April 2000, by the Palmer companies.

[26] Target eventually acquired the property for approximately $3.98 per square foot.

Box, and Logan's Roadhouse. Abington noted that: (1) Bank of America bought a portion of the Kayser tract on June 5, 2003, for $566,636; (2) Jack-in-the-Box bought a portion of the Kayser tract on October 15, 2004, for $566,711; and (3) Logan's Roadhouse bought another portion of the Kayser tract on September 1, 2004, for $870,875. The sum total of these sales amounted to $2,004,222. Abington, once again, multiplied the sales amount by a conservative measure for cost of capital—6.25%—to arrive at his damage calculation of $125,264.

Based on the damages awarded by the jury, it is clear that the jury agreed with Abington's damages calculations. Furthermore, based on the foregoing, we conclude that the Palmer companies' damages evidence described, with reasonable certainty, the profits they lost; therefore, we cannot say that the jury was unreasonable in adopting Abington's damages calculations. *See City of Keller*, 168 S.W.3d at 807, 810-11; *see also Miga*, 96 S.W.3d at 213; *Helena Chem Co.*, 47 S.W.3d at 504-05; *Rauschenberg*, 201 S.W.3d at 808. Abington provided the jury with ample documentary and testimonial evidence that was objective in nature and allowed the jury to determine the proper amount of actual damages to award. *Helena Chem Co.*, 47 S.W.3d at 504; *Szczepanik*, 883 S.W.2d at 649; *Teletron Energy Mgmt., Inc.*, 877 S.W.2d at 279; *Heine*, 835 S.W.2d at 84; *see Orchid Software, Inc.*, 804 S.W.2d at 211. Moreover, SJW did not offer any evidence contradicting Abington's calculations, nor did it object to the admission of Abington's testimony or exhibits as to damages.

We note that in virtually all damages calculations, there is some degree of subjectivity involved, especially when forecasting future profits and losses. However, we do not believe that the evidence submitted by the Palmer companies as to actual damages was speculative in nature or failed to describe with reasonable certainty the damages

sustained. Thus, we cannot say that the jury's actual damages award, viewed in a neutral light, was so contrary to the overwhelming weight of the evidence as to be clearly wrong or unjust. *See Cain*, 709 S.W.2d at 176. Accordingly, we uphold the jury's actual damages award and overrule SJW's third issue to the extent that it challenges the jury's actual damages award.

## B. The Jury's Award of Exemplary Damages Against SJW

### 1. Standard of Review

Exemplary damages must be established by clear and convincing evidence; thus, an elevated standard of review. *Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 627 (Tex. 2004); *see* TEX. CIV. PRAC. & REM. CODE ANN. § 41.003(a) (Vernon Supp. 2009). Clear and convincing evidence is that "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(2) (Vernon 2008); *see Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 31 (Tex. 1994). This intermediate standard falls between the preponderance standard of civil proceedings and the reasonable doubt standard of criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979); *see Strange*, 256 S.W.3d at 775. "While the proof must weigh heavier than merely the greater weight of the credible evidence, there is no requirement that the evidence be unequivocal or undisputed." *Strange*, 256 S.W.3d at 775 (citing *Addington*, 588 S.W.2d at 570).

## B. Discussion

On appeal, SJW specifically asserts that: (1) the evidence supporting the jury's malice finding is legally and factually insufficient; and (2) the "cap buster" provisions of

58

section 41.008 of the civil practice and remedies code were not properly plead; therefore, the jury's exemplary award was excessive.[27]

### 1.    The Jury's Malice Finding

Under legal sufficiency review, when a jury makes an affirmative finding of malice, we review all of the evidence in the light most favorable to the jury's finding, taking into account contrary disputed facts, to determine whether reasonable jurors could have formed a firm belief or conviction regarding malice. *Qwest Int'l Commc'ns, Inc. v. AT&T Corp.*, 167 S.W.3d 324, 326 (Tex. 2005); *see also Garza*, 164 S.W.3d at 627; *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). Under factual sufficiency review, we give due consideration to any evidence the fact finder could reasonably have found to be clear and convincing. *In re J.F.C.*, 96 S.W.3d at 266. We must consider the disputed evidence and determine whether a reasonable fact finder could have resolved that evidence in favor of the finding. *Id.* The evidence is factually insufficient if, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of its finding is so significant that a fact finder could not have reasonably formed a firm conviction or belief. *Id.*

Here, question number 25 of the charge asked the jury whether there was "clear and convincing evidence that the harm to G.J. Palmer, Jr. resulted from malice." The charge further explained that "'[m]alice' means a specific intent by SJW Property Commerce, Inc. to cause substantial injury or harm to G.J. Palmer, Jr." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(7) (defining malice as "a specific intent by the defendant to cause substantial injury or harm to the claimant"). The jury answered in the affirmative to question number 25 of the charge. The Palmer companies were subsequently awarded $2 million in

---

[27] SJW also argues that the jury's exemplary damage award was erroneous because the Palmer companies' did not "submit a question asking if an employee of PCDC committed an intentional tort." However, because we have concluded that the Palmer companies' claims against PCDC are time-barred, we need not address this contention. *See* TEX. R. APP. P. 47.1.

exemplary damages against SJW. The trial court's final judgment adopted the jury's exemplary damages award.

The evidence shows that Stanley and Jay Williams and Trozzo were all associated with SJW and that their actions served as the basis of the Palmer companies' causes of action. Stanley testified that he had retired ten to twelve years prior to this dispute and that he merely facilitated the development of the Trenton Project. However, Stanley later seemed to contradict himself when he admitted that he consults with Jay Williams, the president and owner of SJW, about deals "about every hour." Furthermore, Palmer alleged that Stanley was heavily involved in the development of the Trenton Project because he directed the actions of Jay Williams and Trozzo, and Stanley met with Palmer to negotiate the assignment of Palmer's earnest money contracts in exchange for the REA. In addition, prior to negotiating the assignment of Palmer's earnest money contract in exchange for the REA, Stanley agreed to no longer allow Jay Williams and Trozzo to be involved in the development of the Trenton Project. However, shortly after negotiations were finalized, Trozzo bid up the price of the Kayser tract to apparently render Palmer's REA worthless.

Moreover, the record reflects that: (1) Jay Williams actively participated in the development of the Trenton Project; (2) several witnesses recalled seeing Jay Williams at various meetings to discuss the progress of the Trenton Project; and (3) Jay Williams signed most of the relevant documents in this dispute in his capacity as president of SJW. Trozzo, Jay Williams's brother-in-law, testified that: (1) he is "an independent contractor" who works for SJW; and (2) as an employee of SJW, he typically takes direction from Jay Williams.

In addition, Dr. Kilgore testified as to SJW's actions to get him under contract to tie up the Trenton Project until Palmer's earnest money contracts expired so that SJW could

develop the property itself. Furthermore, Wayne Allen testified that the landowners were approached by Trozzo to induce them to terminate their contracts with Palmer and sign new contracts with SJW. These actions transpired all the while Palmer, Schwarz, and the landowners believed that SJW was acting as Palmer's broker on the development project. In fact, Porter testified at trial that he reviewed the depositions, documents, and pleadings in this case and the Real Estate License Act and other ethical rules promulgated by the Texas Real Estate Commission and, based on that information, concluded that an agency relationship existed between SJW and Palmer at the Trenton Project.

Another expert, Mark Freeland, confirmed Porter's findings and testified that he believed SJW began working as Palmer's broker at the Trenton Project in 2000. Freeland also noted that the correspondences between SJW and Palmer did not contain a correspondence from SJW expressing that it was not Palmer's broker at the Trenton Project. Freeland stated that the course of conduct between SJW and Palmer at the Trenton Project gave rise to an agency relationship and the expiration of the Listing Agreement at the Jackson Palmer Crossing site had no bearing on the existence of the agency relationship at the Trenton Project. Porter and Freeland's conclusions as to agency were contested by SJW; however, the jury ultimately concluded that an agency relationship existed between SJW and Palmer.

The record also demonstrates that Palmer regularly discussed confidential pricing and contractual information with Stanley and Jay Williams at various meetings even though SJW later argued at trial that the parties were competitors. However, SJW never once disclosed to Palmer that the parties were competitors, nor did it request that Palmer discontinue revealing confidential information regarding the Trenton Project.

We find that the evidence supports a finding that SJW authorized, ratified, or adopted

the acts of malice perpetrated by Stanley and Jay Williams and Trozzo, and that, in particular, Jay Williams, president of SJW, participated in the wrongful conduct that transpired at the Trenton Project. *See Qwest Int'l Commc'ns*, 167 S.W.3d at 326 (stating that a corporation is liable for exemplary damages only if it: (1) authorizes or ratifies an agent's malice, (2) maliciously hires an unfit agent, or (3) acts with malice through a vice principal) (citing *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 921-22 (Tex. 1998); *Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 391 (Tex. 1997) (defining a "vice principal" as (1) a corporate officer; (2) those who have authority to employ, direct, and fire employees; (3) those who engage in non-delegable duties; and (4) those is charge of the management of a department or division of the business)). In reviewing the evidence in the light most favorable to the jury's malice finding, we conclude that reasonable jurors could have formed a firm belief or conviction regarding malice. *See Qwest Int'l Commc'n, Inc.*, 167 S.W.3d at 326; *see also Garza*, 164 S.W.3d at 627; *In re J.F.C.*, 96 S.W.3d at 266. We further conclude that, in light of the entire record, the jury was reasonable in concluding that SJW's actions at the Trenton Project were malicious. *See In re J.F.C.*, 96 S.W.3d at 266.

**2.      The "Cap Buster" Provisions of the Texas Civil Practice and Remedies Code**

Section 41.008 of the civil practice and remedies code allows for the recovery of two times the amount of economic damages plus an amount equal to any non-economic damages found by the jury, not to exceed $750,000. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.008 (Vernon Supp. 2009). "[T]he amount of exemplary damages to be awarded is within the discretion of the trier of fact." *Id.* § 41.010(b) (Vernon 2008). The following factors are relevant to the assessment of the amount of exemplary damages that should be assessed against a tortfeasor: (1) the nature of the wrong; (2) the character of the

62

conduct involved; (3) the degree of culpability of the wrongdoer; (4) the situation and sensibilities of the parties concerned; (5) the extent to which the conduct offends a public sense of justice and propriety; and (6) the net worth of the defendant. *Id.* § 41.011(a) (Vernon 2008). In our opinion, we must "address the evidence or lack of evidence with specificity" as it relates to the statutory requirements. *Id.* § 41.013(a) (Vernon 2008).

On April 10, 2007, SJW first invoked section 41.008's exemplary damages cap. This filing preceded the commencement of the trial in this dispute by six days.[28] The Palmer companies filed their opposition to SJW's April 10, 2007 filing, alleging that the filing was prejudicial on its face and requesting that motion for leave be denied. *See Chapin & Chapin, Inc. v. Tex. Sand & Gravel Co.*, 844 S.W.2d 664, 664 (Tex. 1992) (per curiam) ("Rule 63, [of the Texas Rules of Civil Procedure] states that pleadings may be amended within seven days of trial only after leave of the judge is obtained, which leave shall be granted by the judge unless there is a showing that such filing will operate as a surprise to the opposite party."); *see also* TEX. R. CIV. P. 63. Texas courts have held that the punitive damage cap must be pleaded and proved. *See Shoreline, Inc. v. Hisel*, 115 S.W.3d 21, 25 (Tex. App.–Corpus Christi 2003, pet. denied) ("Where maximum damages are provided in statutes in Texas, and a defendant wants to rely on the cap, it is considered a defense that must be plead and proved.") (citing TEX. R. CIV. P. 94; *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 896-97, 904-05 (Tex. 2000)); *see also Marin v. IESI TX Corp.*, No. 01-08-00539-CV, 2010 Tex. App. LEXIS 981, at *45 (Tex. App.–Houston [1st Dist.] Feb. 11, 2010, no pet. h.) (mem. op.) (noting that section 41.008's exemplary damages cap is an affirmative defense that must be pleaded); *Wackenhut Corr. Corp. v. De La Rosa*, 305 S.W.3d 594, 651 (Tex. App.–Corpus Christi 2009, no pet.) (same). Moreover, the failure

---

[28] Trial in this matter commenced on April 16, 2007.

to raise a new defense via an amended pleading more than seven days before trial without leave constitutes surprise and is prejudicial on its face if it does not give plaintiff "fair notice" of defendant's intent to invoke the cap. *See Chapin & Chapin, Inc.*, 844 S.W.2d at 664; *see also Horizon/CMS Healthcare Corp.*, 34 S.W.3d at 896-97.

Here, the record does not reflect that the trial court granted SJW leave to file its late April 10, 2007 pleading first asserting the exemplary damages cap. *See* TEX. R. CIV. P. 63. Furthermore, the jury was presented with a charge that did not include language pertaining to section 41.008's exemplary damages cap and subsequently awarded the Palmer companies $709,587 in actual damages and $2 million in exemplary damages. The jury's damages award was not broken into economic and non-economic damages; however, we presume that the jury's $709,587 actual damages award constituted an economic damages award and that no non-economic damages were awarded. Thus, the jury's $2 million exemplary damages award constituted more than two times the amount of economic damages awarded by jury. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.008. Because section 41.008 mandates that exemplary damages are limited to two times the amount of economic damages awarded, plus non-economic damages, not to exceed $750,000, and the jury was awarded more than two times the amount of economic damages awarded, we cannot say that section 41.008's exemplary damages cap was considered by the jury. *See id.* Based on the foregoing, we conclude that the jury's failure to impose the exemplary damages cap and the lack of evidence demonstrating that the trial court granted SJW leave to file its April 10, 2007 pleading demonstrates that the trial court refused to grant SJW leave to file its late filing and implicitly concluded that SJW's late filing operated as a

64

surprise to the Palmer companies.[29]  *See* TEX. R. CIV. P. 63.  Because SJW was required to properly plead section 41.008's exemplary damages cap and failed to do so, we conclude that the damages cap was not properly before the jury.

Based on our review of the record, we further conclude that the Palmer companies proved by clear and convincing evidence that they were entitled to an exemplary damages award based on SJW's malicious conduct at the Trenton Project.  *See Garza*, 164 S.W.3d at 627; *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 41.003(a).  Employing the proper standards of review, we hold that the evidence supporting the jury's exemplary damage award is legally and factually sufficient.  *See Qwest Int'l Commc'n, Inc.*, 167 S.W.3d at 326; *see also Garza*, 164 S.W.3d at 627; *In re J.F.C.*, 96 S.W.3d at 266. Accordingly, we overrule SJW's third issue as it pertains to the jury's exemplary damages award.

### VI.  ATTORNEY'S FEES AND EXPENSES AWARDED TO PALMER

In their fourth and final issue, SJW argues that the Palmer companies are not entitled to attorney's fees because a plaintiff in a tortious interference with an existing contract cause of action may only recover actual damages rather than attorney's fees.  SJW further argues that the Palmer companies cannot recover attorney's fees under article 6.04 of the Listing Agreement because the Palmer companies did not prevail on the cause of action—the failure to pay commissions for bringing tenants to the Jackson Palmer Crossing shopping center—brought under the Listing Agreement.  The Palmer companies claim

---

[29] The Palmer companies argue on appeal that it did not have time to specifically plead any "cap busting" theories because of SJW's late filing.  Moreover, the Palmer companies highlight the fact that SJW did not object to any of the charge questions that pertained to damages, much less request that the charge include language about the exemplary damages cap.  *See Allen v. Am. Natural Ins. Co.*, 380 S.W.2d 604, 609 (Tex. 1964) ("'Where, however, the ground (of recovery or defense) is submitted, however erroneously or incompletely, the parties are thereby put upon notice that the jury's answers to the issues actually submitted will form the basis of the court's judgment thereafter to be rendered thereon. *It then becomes the duty of each party to point out errors of omission or commission, or be held estopped from thereafter urging them.*'") (quoting *Panhandle & S. F. Ry. Co. v. Friend*, 91 S.W.2d 922, 930 (Tex. Civ. App.–Austin 1936, no writ)) (emphasis in original).

entitlement to the jury's attorney's fees award because they prevailed on their counterclaims and the Listing Agreement provides that attorney's fees may be awarded to the prevailing party for any action or proceeding relating to the agreement.

## A. Standard of Review and Applicable Law

An award of attorney's fees is reviewed under an abuse of discretion standard. *Dail v. Couch*, 99 S.W.3d 390, 391 (Tex. App.–Corpus Christi 2003, no pet.) (citing *Ragsdale v. Progressive Voters League*, 801 S.W.2d 880, 881 (Tex. 1990)). The test for abuse of discretion is to determine whether the trial court acted without reference to any guiding rules or principles, or whether, under the circumstances of the case, the trial court's actions were arbitrary or unreasonable. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985).

"Under the American Rule, litigants' attorney's fees are recoverable only if authorized by statute or by a contract between the parties." *Intercontinental Group P'ship v. KB Home Lone Star, L.P.*, 295 S.W.3d 650, 653 (Tex. 2009) (citing *MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 669 (Tex. 2009) (citing *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 310-11 (Tex. 2006))). Section 38.001 of the civil practice and remedies code provides that reasonable attorney's fees may be recovered:

> from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for:
>
> (1) rendered services;
>
> (2) performed labor;
>
> (3) furnished material;
>
> (4) freight or express overcharges;
>
> (5) lost of damaged freight or express;

(6) killed or injured stock;

(7) a sworn account; or

(8) an oral or written contract.

TEX. CIV. PRAC. & REM. CODE ANN. § 38.001 (Vernon 2008).  The supreme court has held that "before a party is entitled to fees under section 38.001, that 'party must (1) prevail on a cause of action for which attorney's fees are recoverable, and (2) recover damages.'" *KB Home Lone Star, L.P.*, 295 S.W.3d at 653 (citing *Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 390 (Tex. 1997)).

## B.     Discussion

The record reflects that the parties submitted their attorney's fees calculations to the trial court by agreement.[30]  *See Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 860 (Tex. 2005) (per curiam) ("As a general rule, the doctrine of estoppel precludes a litigant from requesting a ruling from a court and then complaining that the court committed error in giving it to him."); *see also Naguib v. Naguib*, 137 S.W.3d 367, 375 (Tex. App.–Dallas 2004, pet. denied) (recognizing the "invited error" doctrine and noting that "[a] party to a lawsuit cannot ask something of a trial court and then complain on appeal that the trial court committed error in granting that party's request").  In any event, after reviewing the Listing Agreement and the testimony adduced at trial, we agree with SJW that the Listing Agreement is not an adequate basis for awarding the Palmer companies attorney's fees because the unambiguous language of the Listing Agreement solely pertains to the Jackson Palmer Crossing site.  Our earlier conclusion that the disputes at Jackson Palmer Crossing and the Trenton Project constituted a single transaction or occurrence centered on the

---

[30] In support of their attorney's fees request, the Palmer companies tendered affidavits from co-counsel at trial, Sarah Pierce Cowen and John R. Griffith, requesting $289,582 as reasonable attorney's fees and $100,570.23 in reasonable expenses.  On appeal, SJW does not challenge the reasonableness of the Palmer companies' attorney's fees requests.

67

parties' relationship, conduct, and correspondence with one another rather than construing the breadth of the Listing Agreement to include the Trenton Project. Nowhere in the Listing Agreement do the parties indicate that they intended for the agreement to cover properties other than those situated at the Jackson Palmer Crossing site.

SJW only cites us to one case supporting its contention that a plaintiff cannot recover attorney's fees for an action for tortious interference with an existing contract. *See Browning-Ferris, Inc. v. Reyna*, 852 S.W.2d 540, 549 (Tex. App.–San Antonio 1992), *rev'd on other grounds*, 865 S.W.2d 925 (Tex. 1993). The *Reyna* case, however, does not mention the propriety of an attorney's fees award in a tortious interference with an existing contract claim. *See id.* Therefore, we do not find this case to be persuasive as to this issue.

As noted previously, the disputes at Jackson Palmer Crossing and the Trenton Project are related so as to constitute a single transaction or occurrence. The crux of the dispute pertaining to the Trenton Project involves SJW's rendering of brokerage services, or lack thereof, to the Palmer companies, which falls under the purview of section 38.001 of the civil practice and remedies code. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(1). The trial court did not abuse its discretion in awarding the Palmer companies attorney's fees because SJW was judicially estopped from complaining about the attorney's fees award given that SJW and the Palmer companies submitted their attorney's fees requests by agreement and because the Palmer companies prevailed and were awarded damages on their counterclaims, which were based on the SJW's rendering of brokerage services, or lack thereof, at the Trenton Project. *See id.*; *see also KB Home Lone Star, L.P.*, 295 S.W.3d at 653; *Downer*, 701 S.W.2d at 241-42; *Dail*, 99 S.W.3d at 391.

However, on rehearing, SJW contends that, because Palmer's counterclaim was one

for tortious interference with contracts, he was not entitled to recover his attorney's fees. SJW relies heavily on our holding in *Alma Group, L.L.C. v. Palmer*, 143 S.W.3d 840, 845-46 (Tex. App.–Corpus Christi 2004, pet. denied), to support its contention. We disagree with SJW's argument that Palmer is not entitled to the recovery of his attorney's fees in this matter.

In *Alma Group*, we denied Palmer his attorney's fees because he "did not prove or recover any damages on either his breach-of-contract or tortious-interference causes of action." *Id.* at 846. In a footnote, we also stated that "there is no statutory or contractual basis for recovery of attorney fees for a tortious-interference claim." *Id.* at 846 n.5 (citing *Ed Rachal Found. v. D'Unger*, 117 S.W.3d 348, 357 (Tex. App.–Corpus Christi 2003), *reversed in part on other grounds*, 207 S.W.3d 330 (Tex. 2006); *Martin-Simon v. Womack*, 68 S.W.3d 793, 797 (Tex. App.–Houston [14th Dist.] 2001, pet. denied)). While SJW is correct in stating that attorney's fees are not recoverable for tortious-interference-with-contract claims, we, again, note that the crux of the dispute pertaining to the Trenton Project involves the rendition of brokerage services, which, as stated above, falls within the purview of section 38.001 of the civil practice and remedies code. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(1). Moreover, the record reflects that Palmer prevailed on his causes of action and was awarded damages for not only his tortious-interference-with-contract claims, but also his fraud and breach of fiduciary duty claims. *See Solis*, 951 S.W.2d at 390. Therefore, given the facts of this case, we do not find the *Alma Group* case to be applicable. Accordingly, we overrule SJW's fourth issue.

## VII. SUFFICIENCY OF THE EVIDENCE THAT APPELLEES WRONGFULLY WITHHELD THE PAYMENT OF COMMISSIONS ASSOCIATED WITH JACKSON PALMER CROSSING

By their sole cross-issue, the Palmer companies contend that the jury's award for

commissions associated with the Jackson Palmer Crossing shopping center is not supported by legally and factually sufficient evidence. Specifically, the Palmer companies argue that the Listing Agreement was not enforceable because it lacked an adequate description of the property involved. SJW responds by arguing that the evidence supports the jury's finding that commissions were owed by the Palmer companies, especially considering Palmer's admissions at trial that he owed the commissions and that SJW brought several tenants to the Jackson Palmer Crossing shopping center. SJW also asserts that the Palmer companies' argument that the contract was unenforceable "is both untenable and unsupported in law or fact."

## A.    Applicable Law

In arguing that the Listing Agreement was an unenforceable contract, the Palmer companies rely on section 1101.806(c) of the Texas Occupations Code. *See* TEX. OCC. CODE ANN. § 1101.806(c) (Vernon 2004). Section 1101.806(c) provides as follows:

> A person may not maintain an action in this state to recover a commission for sale or purchase of real estate unless the promise or agreement on which the action is based, or a memorandum, is in writing and signed by the party against whom the action is brought or by a person authorized by that party to sign the document.

*Id.*; *see Trammel Crow Co. No. 60 v. Harkinson*, 944 S.W.2d 631, 633 (Tex. 1997).

## B.    Discussion

On appeal, the Palmer companies complain about a document, labeled "Exhibit A," which was attached to the Listing Agreement and presented at trial. Palmer testified at trial that "Exhibit A" was a "site plan" for the Jackson Palmer Crossing development "that was never part of the original agreement." The Palmer companies allege that the failure to tender "Exhibit A" at the time the document was signed made the Listing Agreement unenforceable because it did not contain an adequate description of the property in

70

question. The Palmer companies also allege that section 1101.806(c) required that the Listing Agreement contain an adequate description of the property. We disagree with the Palmer companies' contentions.

With respect to "Exhibit A," the Listing Agreement provided that:

WHEREAS, Owner owns the Property described as Exhibit "A" attached hereto and made a party herein by reference, the improvements and fixtures thereon, and all appurtenances thereto (said land, improvements, fixtures and appurtenances and any personal property of Owner on said land or in such improvements being herein called the "Property"). This Property is located at the intersection of business highway 83 and Jackson Road in McAllen, Texas and Pharr, Texas.

"Exhibit A" is a drawing labeled "Site Master Plan," which clearly references all the property in question. The Listing Agreement further provides that SPP, in particular, was responsible for paying SJW a 6% sales commission, a 4% commission for "total lease rental for the primary term (years 1-10)" and a 2% commission "of the total rental for the primary term (years 11-20) of each lease if Broker is the sole source of tenant."

In the instant case, Palmer did not complain about "Exhibit A" until trial. Based on the testimony at trial, it is clear to us that the parties understood to which property the Listing Agreement applied. In addition, the version of the Listing Agreement admitted into evidence as "Plaintiff's Exhibit 1" included "Exhibit A" and described the property in question with reasonable certainty. *See Tex. Builders v. Keller*, 928 S.W.2d 479, 481 (Tex. 1996) (citing *Morrow v. Shotwell*, 477 S.W.2d 538, 539 (Tex. 1972) ("A writing need not contain a metes and bounds property description to be enforceable; however, it must furnish the data to identify the property with reasonable certainty.")); *see also Duncan v. F-Star Mgmt., L.L.C.*, 281 S.W.3d 474, 478-79 (Tex. App.–El Paso 2008, pet. filed).

The thrust of the Palmer companies' argument as to this issue appears to be that "Exhibit A" was not tendered to Palmer at the time of signing and, therefore, the Listing

Agreement was unenforceable because it lacked an adequate property description. The Palmer companies cite to Palmer's testimony at trial that he first saw "Exhibit A" attached to the Listing Agreement when reviewing a lien filed by SJW in 2000. Despite the above-mentioned statements, we note that it was within the province of the jury to reconcile Palmer's allegations that the "Exhibit A" was not presented to him at the time he signed the agreement on behalf of SPP with the version of the Listing Agreement admitted into evidence which clearly references "Exhibit A," includes a copy of "Exhibit A," and provides a description of the property at issue. *See City of Keller*, 168 S.W.3d at 819. In concluding that the Palmer companies were responsible for paying commissions on the Staples and Fashion Bug leases and that the Palmer companies were not excused from compliance with the Listing Agreement, the jury clearly believed that the Listing Agreement was enforceable and that "Exhibit A" was tendered at the time of signing.[31] Because the Palmer companies have not directed us to any evidence in the record, other than Palmer's own self-serving testimony, demonstrating that the jury was unreasonable in its conclusions pertaining to the

---

[31] Question number 10 of the jury charge provided the following with respect to the Palmer companies' failure to pay SJW commissions at the Jackson Palmer Crossing:

> Was G.J. Palmer, Jr.'s failure to comply [with the Listing Agreement's requirement to pay commissions to SJW for bringing tenants to the Jackson Palmer Crossing shopping center] excused?
>
> Compliance is excused if:
>
> a.    The agreement between G.J. Palmer, Jr. and SJW Property Commerce, Inc. is not in writing; or
>
> b.    The agreement between G.J. Palmer, Jr. and SJW Property Commerce, Inc. is not signed by G.J. Palmer, Jr.; or
>
> c.    *The agreement between G.J. Palmer, Jr. and SJW Property Commerce, Inc. does not describe the property subject to the agreement with reasonable certainty; or*
>
> d.    SJW Property Commerce, Inc. breached its fiduciary duty to G.J. Palmer, Jr.
>
> Answer:    No

(Emphasis added.)

leases at Jackson Palmer Crossing and we find none, we must defer to the jury's implicit conclusion that the "Exhibit A" was presented to Palmer at the time of signing the Listing Agreement and that the agreement was enforceable. *See id.*

Moreover, in reviewing section 1101.806(c), we find that the statute merely requires that an agreement to sell or purchase real estate be in writing and signed by the party against whom an action is brought, which does not appear to support the Palmer companies' argument that the Listing Agreement is unenforceable. *See* TEX. OCC. CODE ANN. § 1101.806(c). We therefore reject the Palmer companies' argument that the Listing Agreement was unenforceable because it lacked an adequate property description.[32]

With respect to the Palmer companies' legal and factual sufficiency arguments, we find that the evidence contained in the record supports the jury's verdict. In fact, the record reflects that both SJW and SPP signed the Listing Agreement. Furthermore, Palmer admitted at trial that he owed commissions to SJW for work done at the Jackson Palmer Crossing shopping center, but he chose to withhold the payment of commissions because of what had transpired between himself and SJW at the Trenton Project. *See Mendoza v. Fid. & Guar. Ins.*, 606 S.W.2d 692, 694 (Tex. 1980) (holding that testimony is a judicial admission); *AEP Tex. Cent. Co. v. Pub. Util. Comm'n of Tex.*, 286 S.W.3d 450, 469, n.24 (noting that a "judicial admission is binding on the party admitting it, and he may not introduce contradicting evidence") (citing *Cameron County v. Velasquez*, 668 S.W.2d 776, 782 (Tex. App.–Corpus Christi 1984, writ ref'd n.r.e.)); *see also Tex. Dep't of Pub. Safety v. Morales*, No. 13-07-00552-CV, 2008 Tex. App. LEXIS 3898, at *6 (Tex. App.–Corpus Christi May 22, 2008, no pet.) (mem. op.). The record also contains a letter sent by Palmer to SJW recognizing that SJW was owed commissions for work done at the Jackson Palmer

---

[32] We find it ironic that the Palmer companies request that we find the Listing Agreement to be unenforceable as to the payment of commissions to SJW, yet the Palmer companies use article 6.04 of the same "unenforceable" Listing Agreement to argue entitlement to attorney's fees.

Crossing shopping center and requesting additional time to make such payments. The Listing Agreement provides that it was effective from June 30, 1999 to June 30, 2000, and the record reflects that SJW facilitated the signing of leases by Staples and Fashion Bug at the Jackson Palmer Crossing shopping center during the term of the Listing Agreement.[33]

In reviewing the evidence in the light most favorable to the jury's findings, we conclude that the jury was reasonable in concluding that the Palmer companies were responsible for paying commissions to SJW on the Staples and Fashion Bug leases. *See City of Keller*, 168 S.W.3d at 807, 810-11. Furthermore, in reviewing the evidence in a neutral light, we cannot conclude that the jury's findings as to this issue were so contrary to the overwhelming weight of the evidence as to be clearly wrong or unjust. *See Cain*, 709 S.W.2d at 176. Accordingly, we find that the evidence is legally and factually sufficient, and we overrule the Palmer companies' sole cross-issue. *See City of Keller*, 168 S.W.3d at 807, 810-11; *see also Cain*, 709 S.W.2d at 176.

## VIII. CONCLUSION

Based on the foregoing, we reverse the jury's award of $376,397 in punitive damages against PCDC and render judgment that the Palmer companies take nothing as to PCDC. However, because the trial court concluded that SJW and PCDC were jointly and severally liable for the jury's award of $376,397 in actual damages, we affirm the jury's damages awards against SJW. Moreover, we affirm the remaining aspects of the trial court's judgment.

_____
ROGELIO VALDEZ
Chief Justice

Delivered and filed the
23rd day of September, 2010.

---

[33] On appeal, SJW does not claim entitlement to commissions that may be associated with the Factory 2-U lease at the Jackson Palmer Crossing shopping center.